In re Thomas S. HUNTER and Susan
T. Hunter, Debtors.

Thomas S. HUNTER and Susan T.
Hunter, Plaintiffs,

v.

UNITED STATES of America, acting
Through the FARMERS HOME
ADMINISTRATION, Defendant.

Bankruptcy No. 86–80479.
Adv. No. 86–8196.

United States Bankruptcy Court,
C.D. Illinois.

Dec. 29, 1986.

Carl F. Reardon, East Peoria, Ill., for debtors/plaintiffs.

Mark D. Stuaan, Asst. U.S. Atty., Peoria, Ill., for defendant.

## OPINION AND ORDER

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

This matter came on to be heard on the Debtors' complaint to determine the secured status of a loan made to the Debtors by the Defendant, the United States of America, acting through the Farmers Home Administration (Defendant). On December 17, 1979, the Debtors borrowed from the Defendant the sums of $100,-000.00 and $47,000.00 (Operational Loan). They executed the Defendant's standard form of a Security Agreement on equipment (Collateral) which provided, the Debtors were

> "... justly indebted to the Secured Party as evidenced by one or more certain promissory note(s) or other instrument(s), and in the future may incur additional indebtedness to Secured Party which will also be evidenced by one or more promissory note(s) or other instrument(s) ..."

and that the security interest was granted to

> "... secure the prompt payment of all existing and future indebtedness and liabilities of DEBTOR to SECURED PARTY and all renewals and extensions thereof and any additional loans or future advances to DEBTOR heretofore or hereafter made ..."

Each year the Debtors reduced the balance due the Defendant on the Operational Loan and executed new notes, security agreements containing the same language, and Uniform Commercial Code financing statements.

On March 11, 1981, the Debtors borrowed an additional $200,000.00 from the Defendant (Ownership Loan). The note

which the Debtors signed was the Defendant's standard form of note, which indicated the loan was an initial loan and not a consolidation, rescheduling, or reamortization. As part of the boiler plate language of the standard form, there was a place for indicating if there were any loans being consolidated, rescheduled, or reamortized. This portion of the note was left blank. Just below this portion of the note, the note read:

"Security instruments taken in connection with the loans evidenced by these described notes and other related obligations are not affected by this consolidating, rescheduling, or reamortizing. These security instruments shall continue to remain in effect and the security given for the loans evidenced by the described notes shall continue to remain as security for the loan evidenced by this note, and for any other related obligations."

There was no boiler plate language cross-collateralizing the Ownership Loan with the Collateral given with the Operational Loan. At the bottom of page 2 of the note, the Defendant's loan officer typed in the following:

"THIS NOTE IS SECURED BY A JUNIOR MORTGAGE AS TO TRACT I DESCRIBED IN SAID MORTGAGE DATED MARCH 11, 1981, AND BY A FIRST MORTGAGE AS TO TRACT II."

As security for the Ownership Loan, the Debtors signed the Defendant's standard form of real estate mortgage. The mortgage provided it is security for the Ownership Loan. It contained no reference to the Operational Loan.

Thereafter, in the years 1982 through 1985, the Debtors executed renewal notes and security agreements for the Operational Loan in the manner stated above. The Debtors testified that the Defendant never advised them the loans were cross-collateralized, and both the Debtors and the Defendant always considered these loans to be separate.

In December of 1985, the Debtors borrowed money from a relative and repaid the Operational Loan. The Debtor, Thomas S. Hunter, went to the Defendant's office and he told the Defendant's loan officer he was reorganizing Debtors' finances and he wanted to pay the Operational Loan in full. After the Operational Loan was paid, the Defendant sent Debtors the notes, but did not release the lien on the Collateral. The Debtor contacted the Defendant's loan officer and was advised the lien would not be released because the Defendant, as a matter of policy, did not release liens, but the Defendant would consider a subordination. All this occurred without the Debtors being represented by an attorney.

Because the Defendant would not release its lien on the Collateral, the Debtors filed their complaint to determine whether the Ownership Loan was cross-collateralized by the Collateral given as part of the Operational Loan. At the time of the hearing the Debtors still had the Collateral but were in the process of terminating their farming operation and contemplated selling the Collateral. The basic determination before this Court is the effect to be given to the dragnet clause found in the security agreement given as part of the Operational Loan.

Before the Court makes that determination, it must decide whether parol evidence is admissible to ascertain the agreement of the parties. The Defendant takes the position parol evidence is inadmissible to contradict the clear and unambiguous language of the security agreement. While it is true parol evidence is inadmissible to contradict the clear and unambiguous language of a document, it is also true where an instrument is ambiguous, or there is ambiguity between instruments, parol evidence is admissible to show the parties' intent and the agreement reached. *Sunstream Jet Exp. v. International Air Service Co., Ltd.*, 734 F.2d 1258 (7th Cir.1984).

■ In the case before this Court, although the language of the security agreement is clear and unambiguous, there is an ambiguity created between the security

agreement and the language of the promissory note given for the Ownership Loan. The security agreement provides the Collateral is security for several notes or for additional indebtedness that may be incurred at some point in the future. However, the note evidencing the Ownership Loan does not have boiler plate language creating cross collateralization, and the added language only refers to a mortgage on real estate and makes no reference to a security interest in the Collateral. As there is an ambiguity between these two documents, parol evidence is admissible to determine the intent and agreement of the parties.

Dragnet clauses are specifically authorized by Section 9–204(3) of the Uniform Commercial Code [1] which reads as follows:

"Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment...."

In discussing this authorization, Professor Gilmore in his work (1 *Gilmore, Security Interests in Personal Property*, Section 35.5 [1965]) states as follows:

"However, 'covered by the security agreement' is to be read, Section 9–204(5) should certainly not be taken to overrule the so-called 'dragnet' cases under pre-Code law. Legitimate future advance arrangements are validated under the Code, as indeed they generally were under pre-Code law. This useful device can, however, be abused; it is abused when a lender, relying on a broadly drafted clause, seeks to bring within the shelter of his security arrangement claims against the debtor which are unrelated to the course of financing that was contemplated by the parties. In the dragnet cases, the courts have regularly curbed such abuses: no matter how the clause is drafted, the future advances, to be covered, must 'be of the same class as the primary obligation ... and so related

to it that the consent of the debtor to its inclusion may be inferred.' The same tests of 'similarity' and 'relatedness,' vague but useful, should be applied to Section 9–204(5)." (Footnotes omitted)

Some courts have applied the tests of "similarity" and "relatedness" as suggested by Professor Gilmore. Others have not. The Illinois Code comments to Section 9–204 provides as follows:

"A future advance clause was given effect under this subparagraph in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) and in *Stannish v. Community Bank*, 24 B.R. 761 (N.D.Ill.1982), a decision under this subparagraph of the Illinois Uniform Commercial Code. In *Stannish*, the court stated that 'dragnet' clauses are not favored under Illinois law but that they must be enforced under this subparagraph where no ambiguity exists in a dragnet clause. (Citations omitted) Some courts in other states have imposed a 'relatedness' test to determine whether future advances are covered. (Citation omitted) (future advances, to be covered, must be of the same class as the primary obligation and so related to it that the debtor's consent to its inclusion may be inferred). (Citations omitted) The minority view espoused in the latter line of cases cannot be reconciled with the express language of Paragraph 9–204(3)." Ill.Ann.Stat. ch. 26, para. 9–204 (Smith-Hurd 1986).

In *Stannish v. Community Bank of Homewood-Flossmoor*, 24 B.R. 761 (Bkrtcy.1982), the bankruptcy court had occasion to examine the enforceability of dragnet clauses under Illinois law. In that opinion, the bankruptcy court indicated that although they are not favored under Illinois law, they will be upheld where no ambiguity exists and will be interpreted according to the language used. That court, in turn, relied upon *In re Riss Tanning Corporation*, 468 F.2d 1211 (2nd Cir.

---

1. When the Uniform Commercial Code was originally adopted in Illinois, the authorization was found in Section 9–204(5). Subsequently,

when the Uniform Commercial Code was amended, the provision was relocated to Section 9–204(3).

1972). In this latter case, the Federal Court of Appeals had occasion to rule on dragnet clauses based upon the law of New York. In upholding the dragnet clause, the Federal Court of Appeals indicated that New York courts for many years have construed future advance clauses liberally, and that the Uniform Commercial Code supports their use, and went on to hold the contractual provision valid where it was clear and unambiguous the equipment was security for the note as well as for the payment of any other obligations or liability due or to become due whether now existing or hereafter arising.

This Court believes that the decisions in *Stannish* and in *Riss Tanning* are a proper application of Section 9–204 to dragnet clauses, and that the decision in *Stannish* represents the law in Illinois. However, this Court does not believe that these holdings are applicable to the facts of this case. In those cases, there was no ambiguity as to the language of the document. In the case before this Court, there is ambiguity between the security agreement used for the Operational Loan and the note used for the Ownership Loan. Given such ambiguity, and after hearing the testimony of the Debtor, Thomas S. Hunter, and considering the fact the Ownership Loan note only refers to a real estate mortgage and does not refer to a security interest in the Collateral, this Court concludes the Debtors did not intend to grant a security interest in the Collateral as security for the Ownership Loan, and the dragnet clause was not effective under Section 9–204 to create a security interest in the Collateral as security for the Ownership Loan.

Where, as in this case, the terms of an agreement are not clear or are ambiguous, the agreement should be construed to give effect to the intention of the parties, which intention should be ascertained by an examination of all the facts and circumstances manifested by the evidence, including the relationship of the parties, subject matter of the agreement, and the purpose or object for which it was created. *Ricke v.*

*Ricke*, 83 Ill.App.3d 1115, 405 N.E.2d 351, 39 Ill.Dec. 598, 601 (2d Dist.1980). Furthermore, an agreement should be construed most strongly against the party who prepared it, for the reason that he chose the words to be used and is therefore more responsible for the existence of the ambiguities. *Ricke v. Ricke*, 83 Ill.App.3d 1115, 405 N.E.2d 351, 39 Ill.Dec. 598, 602 (2d Dist.1980). The rule of law is applied in this manner because the drafter should be held accountable for the ambiguities of its own expression. *Pescaglia v. Gianessi*, 9 Ill.App.3d 582, 295 N.E.2d 148 (3d Dist. 1973); and *First Capital Mortgage Corp. v. Talandis Construction Corporation*, 47 Ill.App.3d 699, 365 N.E.2d 66, 7 Ill.Dec. 781, 784 (1st Dist., 1977). Had the Defendant wanted to cross-collateralize the Ownership Loan, it would have been a simple matter to add to the note a reference to the security agreement covering the Collateral, just as it added a reference to the mortgage. *See, In re Schmaling*, 783 F.2d 680 (7th Cir., 1986), where the court, in refusing to find a bank's security agreement on crops and their proceeds also covered government PIK payments, said

"Moreover, banks can easily avoid such potential losses of collateral by careful drafting (citation omitted), and we see no good reason to apply unjustifiably loose constructions to documents of this kind."

IT IS, THEREFORE, ORDERED:

1. That the amount of the Defendant's allowed secured claim against the Collateral is Zero, and it is hereby declared to be void.

2. The Defendant, Farmers Home Administration, is ordered to release its lien.

This Opinion and Order is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.