In re Richard L. SWANSON and Janet Swanson, Debtors.

FARM CREDIT BANK OF ST. LOUIS, a Federally Chartered Corporation, Successor by Merger to the Federal Land Bank of St. Louis, Plaintiff,

v.

NATIONAL BANK OF ALEDO, Defendant.

Bankruptcy No. 88–81338.
Adv. No. 89–8081.

United States Bankruptcy Court, C.D. Illinois.

Sept. 5, 1989.

Andrew W. Covey, Peoria, Ill., for debtors.

Douglas R. Lindstrom, Galesburg, Ill., for plaintiff.

Karl Bredberg, Aledo, Ill., for defendant.

OPINION

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

The Debtors, RICHARD L. SWANSON and JANET SWANSON, (jointly referred to as DEBTORS and individually referred to as RICHARD and JANET respectively) and their son, ROGER W. SWANSON, (SON) are farmers. The DEBTORS and their SON have independent farming operations located on the same real estate owned solely by the DEBTORS. In June of 1983 the DEBTORS and their SON filed separate Chapter 11 proceedings. In August of 1983 the DEBTORS filed a Disclosure Statement that provided:

(A) new *short term* lender, the National Bank of Aledo, will loan $170,000 to the Swansons. Out of these loan proceeds plus cash on hand, The Farmers State Bank of Alpha and the Conrads along with all unsecured creditors will be paid 100% of their debts by the Swansons. The National Bank of Aledo will take as collateral all livestock and machinery of the Swansons.

Under the proposed plan, all creditors were to be paid 100% and long-term indebtedness, including that of the Farm Credit Bank of St. Louis (FARM CREDIT), was to be brought current. The reorganization was in the nature of a take-out arrangement between the DEBTORS, the National Bank of Aledo (BANK), and FARM CREDIT. No other creditors were too concerned or involved. On September 15, 1983, the DEBTORS executed and delivered to the BANK a Guaranty of their SON'S debt to the extent of $125,000.00. On September

16, 1983, RICHARD executed and delivered a promissory note and security agreement to the BANK which gave the BANK a security interest in certain collateral:

> To secure payment of this note to Bank and all other existing and future indebtedness and obligations of Debtors, or any of them, ...

On that same date the SON borrowed from the BANK the sum of $125,000.00. Subsequently, in the DEBTORS' Chapter 11 proceeding, a plan was proposed on November 17, 1983, and confirmed on February 10, 1984,[1] all without mentioning the guaranty.

On December 16, 1986, the SON signed another note and security agreement for the balance then due of $100,594.70. On July 1, 1988, the DEBTORS filed a Chapter 12 proceeding. At this time the DEBTORS owed the BANK $96,881.53 and the SON owed the BANK $82,931.47. The DEBTORS and the BANK contend that the collateral described in RICHARD's note to the BANK is also security for the DEBTORS' guaranty of their SON's debt to the BANK.

FARM CREDIT, a secured creditor of the DEBTORS, filed an adversary proceeding, contending that the collateral given to the BANK by RICHARD does not secure the SON's debt to the BANK.. The BANK takes the position, first, that the language of the note is clear and unambiguous, in that the collateral is security for all of RICHARD's obligations which would include the obligation under the guaranty; and, second, even if the note is not clear and unambiguous, the intent was to have the collateral stand as security for the SON's debt to the BANK. Naturally, FARM CREDIT disagrees with both positions.

In *In re Hunter*, 68 B.R. 366 (Bkrtcy.C. D.Ill.1986), this Court had occasion to discuss the use of dragnet clauses under the Uniform Commercial Code and stated as follows:

> Dragnet clauses are specifically authorized by Section 9–204(3) of the Uniform Commercial Code[1] which reads as follows:

> "Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment...."

In discussing this authorization, Professor Gilmore in his work (1 *Gilmore, Security Interests in Personal Property*, Section 35.5 [1965]) states as follows:

> "However, 'covered by the security agreement' is to be read, Section 9–204(5) should certainly not be taken to overrule the so-called 'dragnet' cases under pre-Code law. Legitimate future advance arrangements are validated under the Code, as indeed they generally were under pre-Code law. This useful device can, however, be abused; it is abused when a lender, relying on a broadly drafted clause, seeks to bring within the shelter of his security arrangement claims against the debtor which are unrelated to the course of financing that was contemplated by the parties. In the dragnet cases, the courts have regularly curbed such abuses; no matter how the clause is drafted, the future advances, to be covered, must 'be of the same class as the primary obligation ... and so related to it that the consent of the debtor to its inclusion may be inferred.' The same tests of 'similarity' and 'relatedness,' vague but useful, should be applied to Section 9–204(5)." (Footnotes omitted)

Some courts have applied the tests of "similarity" and "relatedness" as suggested by Professor Gilmore. Others have not. The Illinois Code comments to Section 9–204 provides as follows:

> "A future advance clause was given effect under this subparagraph in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) and in *Stannish v. Community Bank*, 24 B.R. 761 (N.D.Ill.1982), a decision under this subparagraph of the Illinois Uniform Commercial Code. In *Stannish*, the court stated that

---

1. The Chapter 11 was ultimately dismissed on June 7, 1985.

'dragnet' clauses are not favored under Illinois law but that they must be enforced under this subparagraph where no ambiguity exists in a dragnet clause. (Citations omitted) Some courts in other states have imposed a 'relatedness' test to determine whether future advances are covered. (Citation omitted) (future advances, to be covered, must be of the same class as the primary obligation and so related to it that the debtor's consent to its inclusion may be inferred). (Citations omitted) The minority view espoused in the latter line of cases cannot be reconciled with the express language of Paragraph 9–204(3)." Ill.Ann.Stat. ch. 26, para. 9–204 (Smith–Hurd 1986).

In *Stannish v. Community Bank of Homewood–Flossmoor*, 24 B.R. 761 (Bkrtcy.1982), the bankruptcy court had occasion to examine the enforceability of dragnet clauses under Illinois law. In that opinion, the bankruptcy court indicated that although they are not favored under Illinois law, they will be upheld where no ambiguity exists and will be interpreted according to the language used. That court, in turn, relied upon *In re Riss Tanning Corporation*, 468 F.2d 1211 (2nd Cir. (1972). In this latter case, the Federal Court of Appeals had occasion to rule on dragnet clauses based upon the law of New York. In upholding the dragnet clause, the Federal Court of Appeals indicated that New York courts for many years have construed future advance clauses liberally, and that the Uniform Commercial Code supports their use, and went on to hold the contractual provision valid where it was clear and unambiguous the equipment was security for the note as well as for the payment of any other obligations or liability due or to become due whether now existing or hereafter arising.

This Court believes that the decisions in *Stannish* and in *Riss Tanning* are a proper application of Section 9–204 to dragnet clauses, and that the decision in *Stannish* represents the law in Illinois.

1. When the Uniform Commercial Code was originally adopted in Illinois, the authorization was found in Section 9–204(5). Subsequently, when the Uniform Commercial Code was amended, the provision was relocated to Section 9–204(3).

As indicated by this discussion, dragnet clauses under Illinois law are disfavored, but will be enforced where they are clear and unambiguous.

This case is not similar to *Stannish* and *Riss Tanning* where the courts were presented with the issue of whether direct obligations of a debtor are covered by a dragnet clause. In this case, the obligation in question is the indirect obligation of the DEBTORS to guarantee their SON's debts to the BANK, and the Court must determine whether RICHARD's note to the BANK clearly and unambiguously grants a security interest in the collateral to secure the SON's debt to the BANK. That determination turns on whether the language is so broad and lacks specificity that it cannot be considered clear and unambiguous.

A broad interpretation, by necessity, would include every conceivable type of debt without any limitations. It is doubtful that either the BANK or the DEBTORS intended such a result. For example, would the collateral stand as security for the DEBTORS' guaranty of the debt of an unrelated third party, executed non-contemporaneously with the note. The testimony of the BANK officer that the collateral was to be security for the DEBTORS' loans and their SON's debt, precludes such a result and indicates there are limitations applicable to the reach of the security interest. Therefore, the issue becomes, what were those limitations?

 Intent of the parties plays a special role with respect to the interpretation of dragnet clauses. Courts have stated that future advance clauses cover only advances shown to have been within the contemplation of the parties at the time the security agreement was executed. *In re Bason*, 20 B.R. 49 (Bkrtcy.E.D.Tenn.1982); *In re Brannan*, 5 B.R. 505 (1980). As an aid in effectuating this policy, some jurisdictions have adopted a "relatedness rule" which requires that the subsequent debt be of the

same class as the original debt. As noted in *Hunter*, however, Illinois law does not follow this view.

The BANK officer testified that because the DEBTORS and their SON had independent operations but on a single location, and because the SON had good cash flow, but was asset poor, that the BANK wanted the DEBTORS' guaranty, and that the guaranty was to be cross-collateralized. The BANK officer further testified that prior to RICHARD signing the note, RICHARD was told that the collateral was to secure the SON's debt to the BANK as well.

■ However, RICHARD's testimony was not as adamant. Initially he testified that it was his understanding he would have to pay his SON's debt to the BANK if his SON failed to do so, but he didn't understand that the collateral could be liquidated to satisfy his SON's debt to the BANK. Later he testified that the BANK asked for the collateral as security for his SON's debt. The DEBTORS obviously intended to guarantee their SON's debt to the BANK. But it does not automatically follow that RICHARD intended to cross-collateralize that debt. RICHARD's demeanor while testifying and his conflicting testimony leads this Court to the conclusion that at the time RICHARD signed the note he did not clearly intend to have the collateral secure his SON's debt to the BANK.

Such a result is not unduly harsh. Broad language is not always sufficient to meet the requirements of Article 9 of the Uniform Commercial Code. Although Article 9 of the Uniform Commercial Code does not require excessive detail in the drafting of documents, it does reject over-generalization in favor of enough detail so that the nature of the agreement between the parties can be ascertained. For example, as is pointed out in the Illinois Code Comments to Section 9–110 which sets forth the standard for determining the sufficiency of a description for the purposes of Article 9, the description "all personal property" is plainly insufficient. Ill.Ann.Stat. ch. 26, Section 9–110 (Smith–Hurd 1974). Comparably, with the facts of this case, the reference to "all other existing and future … obligations of debtors" is likewise too general and insufficient under Section 9–204.

It also should be noted that the note is a preprinted form, containing what might be classified as "boilerplate" language which granted the security interest. While there is nothing intrinsically wrong with using preprinted forms with "boilerplate" language, in a case such as this where a question is raised as to what was intended, a note drafted for the particular transaction would be more informative.

The BANK could have avoided the problem by drafting a clause which specifically referred to the guaranty, or at least referred to guaranties in general. As the court stated in *In re Schmaling*, 783 F.2d 680 (7th Cir.1986), in refusing to find a bank's security agreement on crops and their proceeds also covered government PIK payments:

> Moreover, banks can easily avoid such potential losses of collateral by careful drafting (citation omitted), and we see no good reason to apply unjustifiably loose constructions to documents of this kind.

■ FARM CREDIT makes one other attack on the guaranty. FARM CREDIT, citing *Finn v. Heritage Bank and Trust Company*, 533 N.E.2d 539, 540, argues that there was no consideration for the guaranty, as the loan was not made contemporaneously with the guaranty, but was made after the guaranty. In *Finn* the loan was made and the guaranty given subsequently, and the court held that where a guaranty and a loan are contemporaneously executed, a loan is consideration for the guaranty, but where the loan is first made and the guaranty is then given, additional consideration is required. In this case, the two transactions, occurring a day apart, are contemporaneous. In *Elsberry Equipment Company v. Hickman Short*, 63 Ill.App.2d 336, 211 N.E.2d 463 (4th Dist.1965), the court rejected the contention that contemporaneous means the same day, and stated that "contemporaneous means so proximate in time as to grow out of, elucidate and explain the quality

and character of the transaction, or an occurrence within such time as would reasonably make it a part of the transaction." Furthermore, the loan to the SON was made after the guaranty was given, and the loan constituted consideration for the guaranty. *See Dixon v. Schwartz*, 205 Ill. App. 349 (1st Dist.1917) (Abstract Opinion).

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

## ORDER

For the reasons set forth in an Opinion filed this day;

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that the security interest granted by the promissory note and security agreement dated September 16, 1983, does not secure the debts of Roger W. Swanson to the National Bank of Aledo.