**In re Kenneth W. GIBSON and Ramona Gibson, Debtors.**

**Bankruptcy No. 98–47101 TG.**

United States Bankruptcy Court,
N.D. California,
Oakland Division.

June 3, 1999.

Lawrence Szabo, Oakland, CA, for debtor.

Todd Kehrli, Concord, CA, for creditor.

## MEMORANDUM OF DECISION

LESLIE TCHAIKOVSKY, Bankruptcy Judge.

The above-captioned debtors (the "Debtors") object to the assertion of secured

status for a claim filed by United Airlines Employee's Credit Union (the "Credit Union"), Mr. Gibson's employer. The claim is based on Mr. Gibson's Visa card debt (the "Visa Claim"). The Visa Claim must be allowed as a secured claim if a clause contained in a security agreement executed by the Debtors in connection with a subsequent loan (the "Dragnet Clause") is enforceable. The Dragnet Clause provides that the collateral given for the subsequent loan will serve as security for any debt of the Debtors to the Credit Union. For the reasons stated below, the Court finds that the Dragnet Clause is not enforceable and that the Visa Claim is unsecured.

## SUMMARY OF FACTS

In 1993, Mr. Gibson, an employee of United Airlines, obtained a Visa card from the Credit Union. Mr. Gibson did not give the Credit Union any collateral to secure this extension of credit at time the Visa card was issued. Mr. Gibson's debt to the Credit Union for charges made on the Visa card has always accrued interest at the rate of 12.96 percent per annum.

In 1996, the Debtors borrowed approximately $23,000 (the "1996 Loan") from the Credit Union. In connection with the 1996 Loan, the Gibsons executed a loan and security agreement (the "1996 Loan and Security Agreement"). The 1996 Loan and Security Agreement provides that the balance due to the Credit Union will accrue interest at the rate of 8.9 percent per annum. The 1996 Loan and Security Agreement states that the Debtors give the Credit Union a security interest in two cars and Mr. Gibson's shares in the Credit Union (the "Collateral") to secure the 1996 Loan obligation.

The back of the 1996 Loan and Security Agreement contains a series of pre-printed terms and conditions of the loan. One of these pre-printed terms and conditions—the Dragnet Clause—purports to make the Collateral security for any debt owed by either of the Debtors to the Credit Union as well as for the 1996 Loan obligation. The Debtors contend that no one representing the Credit Union pointed this language out to them in 1996. The Credit Union does not dispute this contention. There was no adjustment made in the interest rate charged on the Visa card debt in 1996.[1]

The 1996 Loan and Security Agreement also contains a pre-printed provision stating that the Agreement "shall be governed by and construed in accordance with the laws of the State of Illinois" (the "Choice of Law Clause"). The same paragraph states that "1) all disputes arising under this Agreement shall be resolved in Cook County, Illinois; and 2) that they submit themselves to jurisdiction and venue of the Illinois Circuit Court in and for Cook County" (the "Forum Selection Clause"). The Credit Union's principal place of business is in Cook County, Illinois.

When the Debtors commenced this chapter 13 case, Mr. Gibson owed the Credit Union $4,846.06 on the Visa card and the Debtors owed the Credit Union $14,759.97 on the 1996 Loan obligation. The value of the Collateral was sufficient to cover both of these obligations. The Credit Union filed two proofs of claim in the chapter 13 case, one for the Visa card debt and one for the 1996 Loan obligation. Originally, only the 1996 Loan claim was described as secured; the Visa Claim was described as unsecured. However, shortly thereafter, the Credit Union filed an amended Visa Claim, asserting secured status for that claim as well.

## DISCUSSION

### A. INTRODUCTION

The Debtors contend that the Dragnet Clause is unenforceable and that the Visa Claim is unsecured. The Credit Union disputes these contentions. However, be-

---

1. Neither party has submitted any declarations to support their recitation of the relevant facts. However, the facts do not appear to be in dispute.

fore determining which party is correct, the Court must determine what state's law governs the issue. California is the state with the most significant contacts with the 1996 Loan transaction. However, the Choice of Law Clause provides that all issues relating to the 1996 Loan and Security Agreement will be determined under Illinois law. The standards applied by California courts in determining whether a Dragnet Clause is enforceable are different from the standards applied by Illinois courts. Therefore, the Court must determine which state's law governs. The Court will address the choice of law issue first. Then, the Court will address the enforceability of the Dragnet Clause.

## B. WHAT STATE'S LAW GOVERNS THE DRAGNET CLAUSE ENFORCEABILITY QUESTION?

The Court agrees with the Debtors' choice of law analysis up to a point. The Debtors note that there is conflicting authority on what forum's law a federal bankruptcy court should apply when a choice of law issue is presented. The majority rule requires the application of the law of the forum state, including that state's choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *In re Merritt Dredging Co., Inc.*, 839 F.2d 203, 205–06 (4th Cir.), *cert. denied*, 487 U.S. 1236, 108 S.Ct. 2904, 101 L.Ed.2d 936 (1988). The minority rule requires the application of federal common law. *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946); *Woods–Tucker Leasing Corp. v. Hutcheson–Ingram Dev. Co.*, 642 F.2d 744, 748 (5th Cir.1981). The Ninth Circuit follows the minority rule as represented by *Vanston. In re Lindsay*, 59 F.3d 942, 948 (9th Cir.1995); *In re Holiday Airlines Corp.*, 620 F.2d 731, 734 (9th Cir.1980).

However, at this point, the Debtors' analysis and the Court's diverge. Relying on *Vanston*, the Debtors conclude that the federal common law choice of law rules

would require the application of California law because California is the state with the most significant contacts with the parties and the transaction. The flaw with this portion of the analysis is that it ignores the existence of the Choice of Law Clause. *Vanston* did not involve a contractual choice of law clause.

The Credit Union notes that, in *Woods–Tucker*, which was cited with approval in *Lindsay*, the court resolved the choice of law issue by reference to section 1105(1) of the Uniform Commercial Code since both states whose laws potentially governed the dispute had adopted the Code. On this basis, the Credit Union contends that section 1105(1) of the Uniform Commercial Code, which both California and Illinois have adopted, should govern the issue. The Court agrees with the Credit Union's conclusion although it reaches that conclusion by a slightly different route.

As noted above, in the Ninth Circuit, a bankruptcy court must apply federal common law choice of law rules in determining what forum's law applies. *In re Lindsay*, 59 F.3d at 948. Federal common law choice of law rules follow the Restatement (Second) of Conflict of Laws (the "Restatement"). *Chuidian v. Philippine Nat'l Bank*, 976 F.2d 561, 564 (9th Cir. 1992); *Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 782 (9th Cir. 1991). The Restatement has two sections that address choice of law clauses contained in contracts, section 6(1) and section 187. Section 6(1) provides that "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." Restatement (Second) of Conflict of Laws § 6(1) (1971). Section 187 provides its own rules as to when a contractual choice of law clause will be enforced. *Id.* at § 187.

The Court concludes that section 6(1) applies to choice of law clauses in a contract when a state has a statutory directive concerning such clauses. It concludes that section 187 is intended to apply only when there is no such statutory directive. As

noted by the Credit Union, California has a statutory directive on the enforceability of contractual choice of law clauses relating to security agreements. That statutory directive is embodied in section 1105 of the California Commercial Code, California's version of section 1105 of the Uniform Commercial Code.

Section 1105 provides as follows:

(1) Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement this code applies to transactions bearing an appropriate relation to this state.

(2) Where one of the following provisions of this code specifies the applicable law, that provision governs and a contrary agreement is effective only to the extent permitted by the law (including the conflict of laws rules) so specified:

. . .

Perfection provisions of the division on secured transactions. Section 9103.

Cal.Com.Code § 1105 (West Supp.1999). The Credit Union contends that the Choice of Law Clause is enforceable under section 1105(1) because the transaction bears a "reasonable relation" to Illinois. Because the Debtors fail to address the effect of the Choice of Law Clause on the choice of law issue, they do not directly dispute this contention.

The Credit Union fails to address one wrinkle in the analysis presented by section 1105. Section 1105(1) is limited by section 1105(2). Section 1105 provides that, where one of several specified provisions of the Code designate what state's law shall apply, a contractual choice of law clause requiring the application of a different law will only override the Code's designation to the extent permitted by the law of the state designated in the contractual clause (including that state's conflict of laws rules).

One of the provisions of the Code in which the application of a particular state's law is specified is section 9103 of the California Commercial Code, governing perfection of security interests. Section 9103(1)(b) of the California Commercial Code provides that:

(b) Except as otherwise provided in this subdivision, perfection and the effect of perfection or nonperfection of a security interest in collateral are governed by the law of the jurisdiction where the collateral is when the last event occurs on which is based the assertion that the security interest is perfected or unperfected.

Cal.Com.Code § 9103(1)(b) (West Supp. 1999). The Court assumes that the Collateral has always been in California. Therefore, if the enforceability of the Dragnet Clause is viewed as an issue relating to perfection or the effect of perfection or nonperfection, that issue will be determined under California law unless Illinois' choice of law rules permit the parties to agree that the law of another state will govern. Cal.Com.Code § 1105(2).

 Fortunately, the Court concludes that it need not determine whether Illinois's choice of law rules would permit parties to agree that the law of a state other than California may determine the enforceability of the Dragnet Clause. The Court concludes that the enforceability of the Dragnet Clause is not an issue of perfection or the effect of perfection or nonperfection. Therefore, pursuant to section 1105(1) of the California Commercial Code, the Court agrees with the Credit Union that the Choice of Law Clause mandates the application of Illinois law to the determination of whether the Dragnet Clause is enforceable.

## C. IS THE DRAGNET CLAUSE ENFORCEABLE UNDER ILLINOIS LAW?

 Illinois courts closely scrutinize dragnet clauses and strictly construe them.

However, they will enforce such clauses as long as they are clear and unambiguous.[2] The leading case on this issue is *Stannish v. Community Bank of Homewood–Flossmoor*, 24 B.R. 761, 763 (Bankr. N.D.Ill.1982). In *Stannish*, a bank made the debtors three successive loans. The first and third loans did not provide the bank with any security. However, during the interim between these two loans, the debtor obtained a loan from the bank to purchase a vehicle and gave the bank a security interest in the vehicle to secure the loan obligation.

The security agreement contained the following language:

> As part of the explanatory language on the first page of the agreement, the following is found after the words 'Security Interest':

> This loan is secured by a security interest created under this Security Agreement in the property described above which security interest may attach to any accessions thereto.... This Security Agreement will secure future or other indebtedness.

*Id.* at 762. In addition, the security agreement contained the following language as item three in a section entitled terms and conditions:

> Debtor(s) agrees that Holder shall have, and there is hereby created in favor of Holder, a security interest in the Collateral described herein to secure (i) the payment of the debt evidenced hereby, ... and (iv) all other past, present and

future, direct or contingent liabilities of Debtor(s) to Holder....

*Id.* The *Stannish* court found the quoted language clear and unambiguous and therefore found the clause enforceable under Illinois law.

The *Stannish* court cited *National Acceptance Co. v. Exchange Nat'l Bank*, 101 Ill.App.2d 396, 243 N.E.2d 264 (1968) and *Farmers and Mechanics Bank v. Davies*, 97 Ill.App.3d 195, 52 Ill.Dec. 655, 422 N.E.2d 864 (1981) as representative of Illinois law on this issue.[3] In *National Acceptance*, the issue was whether a dragnet clause contained in two deeds of trust was effective to secure a subsequently executed guaranty of a third party's debt to the bank. The *National Acceptance* court concluded that it was, finding the following language clear and unambiguous. First, the deeds of trust contained the following language:

> 'WHEREAS, Mortgagor has executed ... this trust deed to secure, in addition to the note described above, any and all sums, indebtedness, and liabilities of any and every kind now or hereafter owing or to become due from Mortgagor to holders of the Note, however created, incurred, evidenced, acquired, or arising, whether under the note or this trust deed or any other instruments, obligations, contracts or agreements of every kind now or hereafter existing or entered into by and between Mortgagor and holders of the Note or otherwise, and whether direct, indirect, primary, secondary, fixed or contingent, together with interest thereon as provided in said

---

2. A California court, on the other hand, will apply various tests to determine whether the parties truly intended the dragnet clause to apply to the debt in question. One such test is whether the debt in question was related to the debt in connection with which the security was given. If not, the court will presume that the parties did not intend the dragnet clause to apply. *See Union Bank v. Wendland*, 54 Cal.App.3d 393, 404, 126 Cal.Rptr. 549 (1976). Another such test is whether the creditor relied on the security in extending additional credit. Again, if not, the court will presume that the dragnet clause was not in-

tended to apply. *See Wong v. Beneficial Sav. & Loan Ass'n*, 56 Cal.App.3d 286, 295–296, 128 Cal.Rptr. 338 (1976). Under either of these tests, the Dragnet Clause would be unenforceable.

3. The *Stannish* court also noted that section 9–204(3) of the Illinois Revised Statutes expressly authorized an agreement that collateral will secure "future advances or other value whether or not ... given pursuant to commitment." *Stannish*, 24 B.R. at 763.

instruments and any and all renewals and extensions of any of the foregoing, all of which said sums, indebtedness and liabilities are hereinafter referred to as 'future advances', as aforesaid together with any such instruments, are hereby expressly secured by this trust deed ***.'

*Id.* at 404, 243 N.E.2d 264. Second, the guaranty itself "declares that it is secured by one of the deeds." *Id.* at 405, 243 N.E.2d 264.[4]

The Credit Union relies on *National Acceptance* and *Farmers and Mech.*, in particular, *National Acceptance.* It quotes the language in the deeds of trust (failing to note that the guaranty obligation itself referred to the fact that it was secured by the deed of trust). It then contends that the Dragnet Clause is "no less clear and unambiguous" than the quoted language and is in fact "even less arduous."[5] The Court disagrees.

■ The 1996 Loan and Security Agreement consists of one page, with text on two sides. The front side of the Loan and Security Agreement contains all of the key terms of the Agreement other than the Dragnet Clause in conspicuous easy-to-read print. The Dragnet Clause does not appear on this page. Instead, the Dragnet Clause is contained on the reverse side of the document which is packed from margin to margin with a multitude of provisions, single spaced, in minute, difficult-to-read type. Moreover, the language of the Dragnet Clause is buried in the following long complex paragraph (the highlighted language represents the Dragnet Clause):

> As security for payment and performance of your obligation under this agreement, and for extensions and renewals of it, and for payment of any attorneys' fees, court costs and/or collection agency fees incurred by the Credit Union in collecting this loan *and any and all liabilities and obligations, direct or contingent, to the Credit Union,* you grant and pledge to the Credit Union a lien upon and a security interest in the

4. The other reported cases touching on this issue decided under Illinois law add nothing to the analysis. In the second case cited by the *Stannish* court; *Farmers and Mechanics Bank v. Davies*, 97 Ill.App.3d 195, 52 Ill.Dec. 655, 422 N.E.2d 864 (1981); the court merely held that, where there was an ambiguity between typewritten language defining narrowly the debt secured by the collateral and pre-printed language defining that debt more broadly, the bank should have been permitted to introduce parol evidence of the parties' intent. *Id.* at 201, 52 Ill.Dec. 655, 422 N.E.2d 864. In two bankruptcy court decisions applying Illinois law, both decided by the same judge; *In re Hunter*, 68 B.R. 366, 367 (Bankr. C.D.Ill.1986) and *In re Swanson*, 104 B.R. 1 (Bankr.C.D.Ill.1989); the court found that the clauses were ambiguous under the circumstances of those cases and, after permitting parol evidence, concluded that the parties had not intended the collateral to secure the other debt. *Hunter*, 68 B.R. at 368-69; *Swanson*, 104 B.R. at 3. Finally, in a recent Illinois state court case citing *Stannish* with approval, *Metropolitan Life Ins. Co. v. American Nat'l Bank and Trust Co.*, 288 Ill.App.3d 760, 767, 224 Ill.Dec. 511, 682 N.E.2d 72 (1997), the issue was not the enforceability of the dragnet clause but rather whether, as a result of the execution of new loan documents and payment in full of the original loan balance, the parties had intended to terminate the agreement containing the dragnet clause.

5. Because the Debtors erroneously assume that California law governs the enforceability question, they do not directly address the question of whether the Dragnet Clause is clear and unambiguous. However, they address it indirectly by basing their opposition in part on the fact that the clause was buried in boilerplate language contained on the back of the agreement and was not pointed out to them by a representative of the Credit Union before the agreement was executed. They also contend that the Dragnet Clause is unfair and that the Credit Union dealt with the Debtors in bad faith in negotiating the 1996 Loan and Security Agreement because it did not lower the interest rate on the Visa card debt when they purported to change it from an unsecured obligation to a secured obligation. The Court does not find this argument persuasive per se. As discussed below, the unfairness comes from the fact that the provision was not negotiated but rather was, as the Debtors correctly note, "buried" in boilerplate on the back of the 1996 Loan and Security Agreement.

property listed in the "Security" section of the Disclosures, with all attachments, accessories, equipment, additions and accessions now or hereafter attached or appertaining thereto. This security interest shall extend to any collateral now owned or hereafter acquired. The security interest shall not apply to shares in an individual Retirement or Keogh account. A "Share Pledge" is defined below. Collateral securing other loans with us may also secure this loan. You agree to obtain, sign and deliver all documents requested by us to protect our interest in the Property.

This language and presentation is not even close to the language and presentation of the relevant clauses in *Stannish* and *National Acceptance.*

The Credit Union notes that a statement appears on the first page, just above the signature line, that the debtors "agree to the items and conditions on both sides of this Disclosures and Loan and Security agreement and in the collateral insurance disclosure supplement." This fact adds little weight to the Credit Union's position. There are three signature lines, not just one, on the front of the Agreement. The language quoted above is part of a larger paragraph above one of those signature lines. Like the provisions on the reverse side of the Agreement, this language is set forth in minute type that is difficult to read. Moreover, it does not call the Debtors' attention to the substance of the Dragnet Clause in particular; it simply refers to the Debtors to all of the terms and conditions on the reverse side.

▮ The Choice of Law Clause is presented in the same obscurity. However, it is not a key term of the agreement. Neither is it a provision that provides an unequal benefit to the party who drafted the agreement at the expense of the party who may not be aware of its existence. Greater clarity is necessary when the term is significant or weighted heavily in favor of the drafter. For example, the Court has no doubt that the Forum Selection Clause, which is contained in the same paragraph as the Choice of Law Clause, would be unenforceable under Illinois law. *See Williams v. Illinois State Scholarship Comm'n,* 139 Ill.2d 24, 70–73, 150 Ill.Dec. 578, 563 N.E.2d 465 (1990); *Mellon First United Leasing v. Hansen,* 301 Ill.App.3d 1041, 1045, 235 Ill.Dec. 508, 705 N.E.2d 121 (1998).

In *Williams,* the court held unenforceable as adhesion contracts clauses contained in student loan agreements requiring the student borrowers to submit to suit in Cook County, Illinois. The court stated that: "A contractual clause that is part of a 'boilerplate' agreement, such as these . . . contracts, has its significance greatly reduced because of the inequality in the parties' bargaining power. [Citation omitted.]" *Williams,* 139 Ill.2d at 72, 150 Ill. Dec. 578, 563 N.E.2d 465.

Similarly, in *Mellon,* the court held unenforceable a clause in an equipment lease agreement requiring the lessee to submit to suit in Cook County, Illinois where the lessee was a California resident, the transaction had been negotiated in California, and the lessee was not a sophisticated business person. The *Mellon* court stated as follows:

If both parties freely enter into an agreement contemplating such inconvenience should there be a dispute, one party cannot successfully argue inconvenience as the reason for voiding the forum clause. [Citation omitted.] A forum selection agreement reached through arm's-length negotiation between experienced and sophisticated businessmen should be honored by them and enforced by the courts, absent some compelling and countervailing reason for not enforcing it. [Citation omitted.] A forum selection clause contained in "boilerplate" language indicates unequal bargaining power, and the significance of the provision is greatly reduced. See *Williams v. Illinois State Scholarship Comm'n,* 139 Ill.2d 24, 72, 150 Ill.Dec. 578, 563 N.E.2d 465 (1990).

*Mellon,* 301 Ill.App.3d at 1045, 235 Ill.Dec. 508, 705 N.E.2d 121.

■ As with the forum selection clauses in *Williams* and *Mellon,* the Dragnet Clause is not so contrary to public policy that it should not be enforced in an agreement freely negotiated between parties of equal bargaining power. However, based on these two cases, the Court believes that an Illinois court would not enforce such a provision when it is contained in boilerplate in an agreement executed by parties of unequal bargaining power and when the party who drafted the agreement does not call the provision to the other party's attention.

## CONCLUSION

The enforceability of the Dragnet Clause must be determined under Illinois law pursuant to the Choice of Law Clause. Under Illinois law, the Dragnet Clause is unenforceable because it is not clear and unambiguous. Under Illinois law, such clauses will not be enforced if they are not clear and unambiguous. In determining whether such a clause is clear and unambiguous, the Court is not limited to a consideration of the clause or portion of the clause in question, taken out of context. Particularly when the parties are of unequal bargaining power, the Court should also consider whether the language was actually negotiated or was rather "buried" in difficult to read boilerplate. Applying these standards, the Court concludes that the Dragnet Clause is not clear and unambiguous and is therefore unenforceable. As a result, the Debtors' objection will be sustained, and the Visa Claim will be allowed only as an unsecured, nonpriority claim.