722 P.2d 379

**L.B. NELSON CORPORATION OF TUCSON, a California corporation, Plaintiff/Appellant,**

v.

**WESTERN AMERICAN FINANCIAL CORPORATION, a Delaware corporation, Defendant/Appellee.**

**No. 2 CA–CIV 5439.**

Court of Appeals of Arizona, Division 2, Department B.

May 28, 1986.

Leonard, Felker & Parrish, P.C. by Clifford B. Altfeld and Margaret A. Krigbaum, Tucson, for plaintiff/appellant.

Cook & Newman, Ltd. by Donald J. Newman and Lisa A. Perry, Phoenix, and Watkins, Steward, Harris & Kahn by Brett A. Huston, Tucson, for defendant/appellee.

BIRDSALL, Judge.

This appeal involves the right of the appellee, Western American Financial Corporation (Western American) to foreclose various deeds of trust given by the appellant, L.B. Nelson Corporation of Tucson (Nelson), as security for loans on Nelson's housing development, known as Bristol Place, located in Pima County, Arizona. Nelson was the plaintiff in the trial court because it sought to enjoin the foreclosure. On appeal, Nelson contends that the trial court erred:

1) in refusing four requested instructions concerning the "dragnet" clause;

2) in dismissing counts 11, 12, and 13 prior to trial; and

3) in admitting evidence of the source of Western American's funds.

We affirm.

## FACTS

In June of 1981, Nelson undertook the acquisition, development, and construction of a housing development known as Bristol Place. Western American agreed to provide financing for this undertaking pursuant to the terms of a loan commitment letter dated June 26, 1981. The subdivision consisted of four previously constructed townhouses (lots 16, 17, 18, and 19) and 42 undeveloped lots. The acquisition and development (A & D) loan was initially evidenced by a promissory note for $690,-000.00, which was secured by a deed of trust on all the real property. A portion of the construction financing was evidenced by four separate notes, each secured by a deed of trust on all four completed townhouses. The total indebtedness contemplated under the loan commitment was guaranteed by Nelson's parent, L.B. Nelson Corporation, a California corporation.

The A & D loan went into default on April 1, 1982, when Nelson failed to make the interest payment due on that date. The prior interest installments had been paid through an interest reserve account, which was exhausted in March of 1982. The four notes secured by the completed townhouses were due and payable in full on April 13, 1982. Prior payments of interest on these loans had also been made through an interest reserve account. In late March of 1982, Nelson requested additional funds to commence construction on four undeveloped lots, and on April 20, 1982, Doug Nelson, the president of Nelson, advised Western American that it had four buyers for the townhouses for which he was seeking the additional construction funds. These townhouses would be in addition to the existing townhouses on lots

16–19. Based upon that representation, and pursuant to its obligation under the loan commitment letter, Western American proceeded to fund the four additional construction loans on May 18, 1982, by releasing the four lots from the A & D deed of trust and subtracting the release prices from the A & D loan. The release price then became the amount of indebtedness under the separate loans on lots 25, 26, 28, and 29, which were evidenced by separate loan agreements and promissory notes, and were secured by deeds of trust on each of the lots to be improved.

On May 19, 1982, Nelson informed Western American that its parent corporation had cut off all financial support to its subsidiaries. In response to this information and as a result of Nelson's failure to make its interest payments, Western American requested a meeting to discuss the status of Bristol Place. This meeting occurred on May 21 at the subdivision site and was attended by Robert McBride and Bill Stoffers of Western American and Doug Nelson of Nelson Corporation.

At the meeting, Mr. Nelson confirmed that the parent corporation had ceased funding and acknowledged that it had failed to make the April and May interest payments on the A & D loan and the four matured construction loans. He indicated, however, that Nelson could bring the interest current on the loan and the four matured notes by August 30, 1982. He again represented that Nelson had buyers for the four units it was planning to build with the additional construction funds, as well as a cash buyer for lot 62, a Dr. Reeder. He also indicated that Western American should begin receiving five hundred dollars a month from the rental of one of the existing townhouses. Mr. Nelson further represented that it would be able to pay Western American when Dr. Reeder advanced money for construction on lot 62 and from the proceeds from sales of units at another project called Castle Rock. Western American agreed to defer enforcement of its foreclosure remedies until August 30, 1982, based upon these representations. Mr. McBride advised him, however, that if the interest was not brought current by that date as promised, Western American would take appropriate action to protect its security.

Nelson continued with the construction of off-site improvements and began construction of the four units. Throughout the summer, Mr. Nelson represented that the interest payments would be brought current on August 30, 1982. Nelson submitted one draw request in connection with the four new construction loans, which was honored. Additionally, Nelson made three separate draw requests under the A & D loan totaling $63,427.00, which were also honored.

During the period from May 21, 1982, through August 30, 1982, Nelson made no payments on any of the loans. Despite its representations that it had contracts to sell the townhouses on lots 25, 26, 28, and 29, no such contracts materialized. While Dr. Reeder advanced monies to Nelson toward the completion of a house on lot 62, no payments were made to Western American.

Nelson's failure to bring the interest payments current came to the attention of Western American around the first week of September. Mr. McBride called Mr. Nelson to discuss the nonpayment. Nelson claimed the corporation had no money to pay the interest. McBride then wrote the parent corporation, which refused to honor its obligation on its guaranty.

On September 20, Nelson submitted an oral draw request for construction funds on the four new construction loans. McBride informed Nelson that Western American was refusing to honor the draw because of Nelson's failure to bring the interest current on the A & D loan and the four matured construction loans and the parent corporation's refusal to pay Nelson's obligations under these loans.

In October of 1982, the parties met to discuss the possible restructuring of the financing of the loans on the project. At that meeting, the parties made a tentative agreement that Western American would delay the foreclosure proceedings if Nelson

tendered half of the interest in arrears on the A & D loan and the construction loans for lots 16–19. Thereafter, when Nelson informed Western American that it could not pay that amount, Western American commenced trustee sales on all the loans.

A clause in each of the deeds of trust provided:

In addition to securing the indebtedness herein mentioned, this Deed of Trust shall also secure any and all additional indebtedness of trustor to beneficiary or trustee whether as future advancements or otherwise.

This clause is commonly called a "dragnet" clause. The legal status of such a clause is reviewed in an annotation in 3 A.L.R. 4th 690 (1981). It is also referred to as a cross-collaterilization clause and a cross-default clause. As noted, this clause appeared in the A & D deed of trust on the entire development, in those covering lots 16–19, and in each of the four new deeds of trust on lots 25–29, inclusive. Each of the latter deeds of trust recited $18,200 as consideration, the release price. However, as we have noted, this was not "new" money paid by Nelson, but was rather the amount for each lot transferred from the A & D loan obligation. The total amount of money owing to Western American remained the same.

## DRAGNET CLAUSE AND JURY INSTRUCTIONS

Nelson's theory in the trial court was that the dragnet clause was ambiguous and therefore unenforceable. It also argued that the foreclosure on lots 25, 26, 28, and 29 was wrongful since those lots had been released for construction of the new townhouses and draws were refused even though the loans on each of those lots were not in default.

The instructions which it requested were:

*No. 11*—Any ambiguity in an instrument or document should be resolved against the person who wrote the language.

*No. 12*—A provision in an agreement claimed to be a cross-default clause shall be strictly construed against the party drafting it.

*No. 29*—A cross-default provision in any one of the deeds of trust applies only to the lots secured by that Deed of Trust. Thus, assertion of a cross-default provision in the A & D Deed of Trust allows a trustee sale of only those lots secured by the A & D Deed of Trust and must be strictly construed against the party who wrote the clause.

*No. 31*—You are instructed to find that Western American could not assert its cross-default provisions as to lots 25, 26, 28 and 29.

The trial court refused each of these instructions, finding that the clause was not ambiguous.

■ Western American first contends that Nelson failed to make sufficient Rule 51(a) objections to the court's refusal of the instructions. See Rule 51(a), Rules of Civil Procedure, 16 A.R.S. We disagree. Our review of the record shows that Nelson objected because it maintained that the clause was ambiguous and these instructions were necessary to permit the jury to decide whether the clause could be enforced under the facts of the case. We believe this objection was sufficient.

■ However, we do not agree that the instructions should have been given. Nelson contends that the clause was ambiguous because of the language "whether as future advancements *or otherwise.*" It argues that the default on the A & D loan did not activate the clause in the deeds given to secure any of the four construction loans since those lots were released from the A & D trust deed. It then reasons that since the construction loans were not in default and the A & D loan was not a future advance but a prior one, the clause could permit foreclosure only if the "or otherwise" included the default in the A & D loan. For that reason Nelson claims that the words "or otherwise" are ambiguous and that the jury must decide what was intended and do so under the requested instructions.

The trial court disagreed and we believe properly so. Not only is the language clear, Nelson suggests no other meaning for the clause. Nor does Nelson suggest that the parties intended any other meaning. The instructions were properly refused for the reason stated. Considering the record in the manner most strongly supporting the requested instructions, *Winchester v. Palko*, 18 Ariz.App. 534, 504 P.2d 65 (1972), no evidence suggested any other meaning for the clause. Absent evidence justifying instructions on its theory of the case, such instructions were properly refused. *Tucson Utility Supplies, Inc. v. Gallagher*, 102 Ariz. 499, 433 P.2d 629 (1967).

The authorities relied upon by the appellant do not support any contrary ruling. Nelson labels *Canal National Bank v. Becker*, 431 A.2d 71 (Me.1981), as the leading case holding that dragnet clauses are ambiguous. The language of the clause in *Canal* is different from ours. Needless to say, the court in *Canal* was also presented with very different facts. The loans involved in the instant case were all made pursuant to a commitment letter dated June 26, 1981, which outlined financing for the entire Bristol Place project. Each of the deeds of trust securing the various loans made to Nelson Corporation contained the "dragnet clause."

As we have noted, on May 21, 1982, the A & D loan and the four loans on lots 16–19 were in default. The initial disbursements had been made under the four construction loans for lots 25, 26, 28, and 29 to release them from the A & D deed of trust and re-encumber them with individual deeds of trust. The parties met to discuss the status of the project, including Nelson Corporation's financial default under the A & D loan and the loans on lots 16–19. The parties were clearly endeavoring to make it possible for Nelson to make payments on its obligations. No evidence suggests that Western American was giving up its right to have the entire project as security for the funds it had loaned. The dragnet clause was inserted in the four new deeds of trust. If Nelson had made all payments required of it after the release of those lots, no foreclosure would have been possible. It defaulted. Western American had the right to foreclose, including the four new deeds of trust.

The ruling of the trial court, in effect upholding the enforceability of the dragnet clause, comports with the only Arizona opinion on the subject, *Pearll v. Williams*, 146 Ariz. 203, 704 P.2d 1348 (App.1985). In *Pearll* our court upheld a dragnet clause in a mortgage which was executed contemporaneously with one note which did not make reference to the mortgage, and which was not recorded until after a second note was executed. However, the second note referred to the mortgage. Our court held that the mortgage was security for both notes under the terms of the dragnet clause.

In *Pearll* we relied on *Union Bank v. Wendland*, 54 Cal.App.3d 393, 126 Cal Rptr. 549 (1976), for the proposition that there are two tests to determine whether or not a cross-default clause will be enforced, namely, the "relationship of the loans" test and the "reliance on the security" test. We upheld the dragnet clause under the "reliance on the security" test. It was not necessary for the court to reach the "relationship of the loans" test, but we surely did not reject it. That is the appropriate test to be applied here. Under the "relationship of the loans" test, the security instrument will secure both loans where the parties' intent that it do so is inferred from the connection between the loans or from their substantially similar nature. In this case all of the loans were made to finance the same project, Bristol Place, pursuant to the commitment letter. They were all guaranteed by the appellant's parent corporation. They were discussed at the May 21, 1982, meeting where Western American agreed to work with the appellant through August 30 and they all related to the development of Bristol Place. The same corporate borrower signed for the loans and the repayment of all the loans was to be made through Nelson Corpora-

tion's successful marketing of existing and proposed townhouses.

Western American released lots 25, 26, 28, and 29 from the A & D loan deed of trust and created four separate notes and deeds of trust. No evidence shows an intent that lots 25, 26, 28, and 29 be removed as security for the loans. These lots were intended to remain as security for the entire indebtedness, as indicated by the cross-default provision. The appellant cites the language in *Wendland* and *Pearll* to the effect that where the second loan has different security, as a matter of law, the parties did not intend for the collateral of the first loan to secure the second loan. However, both decisions state this to be a conclusion under the "reliance on the security" test. Under the "relationship of the loans" test, the court must look to the nature and circumstances surrounding the loans and not the existence of separate collateral for the loans. Under the "relationship of the loans" test, the cross-default provision is enforceable because all the loans in this case were used to fund the same project.

All the deeds of trust securing the loans in this case contained the cross-default provision. As this court recognized in *Pearll,* the lender's use of the dragnet clause in all the loan documents was held determinative by the court in *Emporia State Bank and Trust Co. v. Mounkes,* 214 Kan. 178, 519 P.2d 618 (1974). In *Emporia* the debtor executed a note which was secured by a mortgage containing a future advance clause. Eight years later, the debtor executed two more notes. Upon default, the secured party sought to foreclose on the mortgage and obtain judgment for the indebtedness evidenced by all of the notes. The subsequent notes, however, made no reference to being secured by the earlier mortgage. The court refused to allow the foreclosure judgment to include the indebtedness on the subsequent notes but noted that if the subsequent notes had referred to the prior mortgage, then they could have been included in the foreclosure judgment. In the case at bar, all the deeds of trust contain the cross-default provision. A rec-

ognized reason for a dragnet clause in development financing is to enable the lender to acquire all the property in the event of a default and subsequent foreclosure. Otherwise, the lender who is in no way at fault might be handicapped in the later disposition of the property. 3 A.L.R. 4th 690 (1981).

## DISMISSAL OF COUNTS 11 AND 12

■ These counts both involve lot 62, the property sold to Dr. Reeder, which was covered by the deed of trust securing the A & D loan. It was the subject of separate proceedings both in and out of the superior court.

Western American commenced its non-judicial foreclosure of the A & D deed in 1983. This action was commenced by Nelson to enjoin the foreclosure. After a hearing, Judge Druke first denied injunctive relief except as to lot 62, presumably because of Dr. Reeder. The parties, in fact, stipulated that the proposed sale of lot 62 could be enjoined.

Lot 62 was excluded from the trustee's sale of the property secured by the A & D deed, and for that reason the bid price at the sale was reduced by $18,200, the individual lot release price. At that point lot 62 was therefore still security for Western's loan and its sale enjoined.

Count 11, contained in Nelson's Third Amended Complaint filed March 9, 1984, alleges:

122. Three months after the trustee sale on the deed of trust securing the "A and D" loan, Western American made no claim for deficiency on the "A and D" note or deed of trust.

123. The "A and D" note and deed of trust were by operation of A.R.S. § 33–814A thereby satisfied in full and Western American waived all further claims to hold lot 62 as security.

124. Nelson of Tucson tendered checks for Ten Dollars and quitclaim deeds to Lew R. Cook and to Western American for lot 62. Lew R. Cook and

Western American refused to execute the deeds.

125. In March 1984, L.B. Nelson Corporation tendered in excess of $21,000.00 to secure the release of lot 62.

A.R.S. § 33–814(A) requires the beneficiary of a deed of trust to maintain an action to secure a deficiency for any balance claimed to be due following a trustee's sale. Since it appears that lot 62 was not sold at trustee's sale, there was no need to secure a deficiency judgment. Nelson paid a release price for lot 62, and therefore we believe Count 11 was properly dismissed.

Count 12 alleged:

126. Nelson of Tucson realleges each and every allegation contained above as if specifically set forth herein.

127. Western American as beneficiary and agent for Lew R. Cook, and Lew R. Cook as trustee under the "A and D" deed of trust and construction loan deeds of trust, and as agent for Western American, owed fiduciary duties to Nelson of Tucson to be fair and honest in their dealing with Nelson of Tucson.

128. On January 31, 1984, Western American and Lew R. Cook through their agents represented to the Arizona Superior Court, Nelson of Tucson and L.B. Nelson Corporation that the release price for lot 62 was $18,500.00.

129. On February 6, 1984 Lew R. Cook and Western American demanded $37,423.16 as the lot release price on lot 62.

130. The demand exceeded the statutory allowable amount by $16,211.90. By their unlawful demand, Western American and Lew R. Cook, at Western American's direction, breached their fiduciary duties to Nelson of Tucson and Western American.

131. Western American attempted to prevent Nelson of Tucson from obtaining lot 62 and the improvements on lot 62 constructed by Nelson of Tucson and the subcontractors.

132. As a proximate result of the breach, Nelson of Tucson has been damaged.

133. The acts of Western American were so willful and wanton as to justify the award of punitive damages.

On appeal, the only contention made is the same as that relating to Count 11. We affirm the dismissal because we believe lot 62 was the subject of separate proceedings whereby Western was enjoined from the foreclosure of any security on that lot, and because Nelson paid the release price fixed by the court for that lot.

## DISMISSAL OF COUNT 13

■ Count 13 alleged:

134. Nelson of Tucson realleges each and every allegation contained above as if specifically set forth herein.

135. Western American by its conduct tortiously interfered with the contractual relations between Nelson of Tucson and Lew R. Cook, and further tortiously interfered with and caused a breach of the fiduciary duties owed by Lew R. Cook, as trustee, to Nelson of Tucson.

136. As a proximate result thereof, Nelson of Tucson has been damaged.

137. The acts of Western American were so willful and wanton as to justify the award of punitive damages.

The trial court dismissed this count, *without prejudice*, on Western's Rule 126(b)(6) motion. A dismissal without prejudice is not appealable and for that reason alone this appeal of that order should be dismissed. See *State v. Boehringer*, 16 Ariz. 48, 141 Pac. 26 (1914).

## EVIDENCE OF SOURCE OF FUNDS

The trial court permitted Western American to show the cost of funds it borrowed from another source to lend to Nelson. Ordinarily, such evidence might be irrelevant. However, Nelson alleged in Count 2 of its complaint that Western American was unjustly enriched by virtue of the foreclosure on Bristol Place. Thus, the evidence was deemed to be relevant.

■ Even assuming that this evidence should not have been admitted, we do not

believe its admission constituted reversible error. The appellant has not demonstrated substantial prejudice to his right to a fair trial. See *Hallmark v. Allied Products Corp.*, 132 Ariz. 434, 646 P.2d 319 (App. 1982). Surely the jury was aware that Western American had to secure the funds from somewhere, and we cannot believe this disclosure could have influenced its verdict. If error, it was harmless.

The appellant also makes various references to excessive attorney fees, but does not assert this as a separate issue on appeal. The trial court reduced the fees requested, indicating an exercise of its discretion. The award is discretionary. *Associated Indemnity Corp. v. Warner*, 143 Ariz. 567, 694 P.2d 1181 (1985).

Affirmed.

LIVERMORE, P.J., and LACAGNINA, J., concur.