In re Joseph A. AUZA, Sr. and Carmen A. Auza, Debtors.

WESTERN FARM CREDIT BANK, and Arizona Agricultural Credit Association, Appellants,

v.

Joseph A. AUZA, Sr. and Carmen A. Auza, Appellees.

BAP No. AZ–94–1167–MVAs.
Bankruptcy No. 91–01592–TUC–LO.
Adv. No. 92–0326.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Jan. 19, 1995.

Decided April 21, 1995.

---

Rebecca R. Driggs, Phoenix, AZ, for appellants.

Michael D. Stofko, Tucson, AZ, for appellees.

Before MacDONALD,[1] VOLINN and ASHLAND, Bankruptcy Judges.

### OPINION

MacDONALD, Bankruptcy Judge:

This case involves the enforceability of dragnet clauses in Arizona. The appellant, creditor Western Farm Credit Bank ("WFCB"), contends the debtors' personal guarantee of loans made to a partnership and corporation is secured by dragnet clauses in security agreements and mortgages the debtors executed to obtain unrelated personal loans. The bankruptcy court found the dragnet clauses unenforceable. We AFFIRM.

## FACTS AND PROCEEDINGS BELOW

The debtors, Joseph A. Auza, Sr. and Carmen A. Auza, had a fifteen-year history of loan transactions with Western Farm Credit Bank and its predecessors in interest, which included the Arizona Agricultural Credit Association and the Arizona Livestock Production Credit Association (collectively referred to as "WFCB"). Between 1975 and 1990, WFCB extended and renewed loans to the Auzas and Joe Auza Sheep Co., an Arizona corporation. On June 6, 1989, the Auzas executed two renewal promissory notes, one in the amount of $1,796,569.66 and the other for $1,030,092.86, with respect to their farm loan indebtedness to WFCB. This indebtedness was further modified by a forbearance and promissory note modification agreement dated November 1, 1990.

The WFCB loans to the Auzas and Joe Auza Sheep Co. were secured by both real and personal property. Between 1975 and 1988, the Auzas executed three mortgages, three deeds of trust, and two security agreements in favor of WFCB to secure the farming loans. All of these security instruments contained dragnet clauses. A dragnet clause from a deed of trust dated July 17, 1986 is illustrative. It secured:

> Any and all indebtednesses and liabilities of Trustor [Joe A. Auza and Carmen A. Auza] to Beneficiary, and any and all advances of Beneficiary to Trustor, the payment and performance of which is hereby guaranteed to Beneficiary by Trustor, of whatever nature, now existing or hereafter arising, due or to become due, absolute or contingent, secured or unsecured, and whether several, joint or joint and several, and any and all extensions, revisions or renewals thereof in whole or in part, and any future advances made by Beneficiary to Trustor however evidenced, including but not limited to payment of those specific indebtednesses described in Exhibit "B" (if any) attached hereto ... and such additional sums of money, as may be from time to time hereafter, during the life of this Deed of Trust, be advanced or loaned to or for Trustor by Beneficiary....

The dragnet clauses in the other security instruments are similar.[2]

---

1. Hon. Donald MacDonald IV, Bankruptcy Judge for the District of Alaska, sitting by designation.

2. For example, a mortgage dated March 29, 1979, provides that it not only secures repayment of the mortgage, but also "the payment of all sums which may be hereafter loaned, paid out, expended or advanced by said mortgagee to said mortgagor, or which may hereafter become due

At the time the Auzas executed the renewal promissory notes on June 6, 1989, they signed one more security agreement which also contained a dragnet clause.

In 1987, prior to the time the Auza farm loans were renewed and modified, WFCB extended a loan to Quality Gin, Inc. ("QGI"), a corporation, and Auza/Riley Investment, a partnership, for the purpose of renovating and operating a cotton gin. Joe Auza was one of the principals of QGI and a partner in Auza/Riley Investment. Joe Riley was the other corporate principal and partner. On October 26, 1987, Auza and Riley, in their capacities as corporate officers of QGI and partners of Auza/Riley Investment, executed a promissory note for $308,900 in favor of WFCB. A renewal promissory note for $401,665 in favor of WFCB was executed by QGI and Auza/Riley Investments July 18, 1988. WFCB also required personal guarantees from both the Auzas and the Rileys for the QGI loans. The Auzas executed a continuing guaranty for the QGI loans on July 18, 1988.

Both QGI loans were secured by real property on which the cotton gin was located as well as the QGI equipment and revenue. In fact, both of the QGI notes to WFCB had separate language typed on them specifying that the notes were to be so secured.[3] Internal bank memoranda pertaining to the approval of both QGI loans also reflected that the loans were to be secured by the real and personal property assets of QGI and Auza/Riley Investments. The bank memoranda reflect that bank personnel also reviewed the financial history and net worth of both Auza and Riley. Nothing in the bank documents indicates that WFCB relied on the dragnet clauses in the security instruments Auza previously executed as security for the QGI loans. Nor is there any indication that WFCB considered Auza's personal guaranty more valuable than Riley's because of the existence of the dragnet clauses.

The Auza's previous loans from WFCB for the Joe Auza Sheep Co. were renewed after the QGI loans were extended. The forbearance and promissory note modification agreement, dated November 1, 1990, pertained solely to the two renewal promissory notes dated June 6, 1989. In fact, the forbearance agreement expressly stated, "[T]his Modification Agreement shall not effect [sic] in any way the obligations and liabilities of Borrower or Guarantor in connection with the indebtedness of Quality Gin to [WFCB]."

QGI subsequently defaulted on its WFCB loans, and filed bankruptcy. WFCB obtained relief from stay to foreclose on the QGI collateral. The Auzas filed a Chapter 11 petition in 1991. WFCB filed a claim for $1,002,841.10 in the Auza bankruptcy case. Of this amount, $632,145.47 represents the principal balance due on the Auza notes, and $435,956.91 represents the deficiency balance on the QGI notes. WFCB, relying on the dragnet clauses in the Auza security instruments, contends its total claim is secured. While the Auzas do not contest the amount of WFCB's claim, they contend that only the portion of WFCB's claim attributable to the Auza notes ($632,145.47) is secured, and that the portion attributable to the QGI guaranty is unsecured.

The Auzas initiated an adversary proceeding against WFCB in December, 1992, to determine the extent of its lien. The matter was submitted to the bankruptcy court on

---

to said mortgagee from said mortgagor ... and also as security for all extensions or renewals of above described notes and/or of notes evidencing sums hereafter loaned, paid out, expended or advanced."

Similarly, a security agreement dated March 1, 1988, defined the indebtedness of the Auzas as "any and all loans, advances, obligations, covenants, and duties owing to Lender by Debtor of any kind or nature, absolute or contingent, due or to become due whether now existing or hereafter arising, whether or not evidenced by any note, guaranty, non-recourse guaranty or other instrument, agreement or writing; including,

without limitation, all interest, charges, fees, attorneys' fees, expenses, and any other sum chargeable by Lender to Debtor under this or any other agreement."

3. The QGI note dated October 26, 1987 stated, "This note is intended to be secured by personal property liens and as a future advance under a Deed of Trust dated October 26, 1987, executed by Auza/Riley Investment, a Partnership, to be filed with Pinal County Recorder, State of Arizona." Similar language was typed onto the QGI renewal promissory note dated July 18, 1988.

stipulated facts. The parties filed cross-motions for summary judgment, which were denied by the bankruptcy court because it felt factual issues were present. The parties subsequently requested the matter be tried on the same set of stipulated facts. The court concluded that the dragnet clause in the Auza note security instruments did not secure Auza's guarantee of the QGI notes.

## STANDARD OF REVIEW

A bankruptcy court's factual findings are reviewed for clear error and its conclusions of law are reviewed de novo. *In re Ewell,* 958 F.2d 276, 279 (9th Cir.1992), citing *In re Arizona Appetito's Stores, Inc.,* 893 F.2d 216, 218 (9th Cir.1990). As this matter was submitted to the bankruptcy court on stipulated facts, review is de novo.

## ISSUE PRESENTED

Whether the dragnet clauses contained in security instruments executed by the Auzas in connection with farm loans they received from WFCB secure obligations of the Auzas under a personal guarantee they executed in favor of WFCB in connection with the QGI loans.

## OVERVIEW

**Dragnet.** [Cf. Sw. dragg-not.] A net which is dragged over the bottom of a river or piece of water in order to enclose all the fish....

Oxford English Dictionary (1933). In the legal context, a dragnet clause has been described as one

which, on its face, purports to include within the coverage of the mortgage all indebtedness of the mortgagor to the mortgagee,

in addition to the specific debt secured by the mortgage, whether incurred before or after the execution of the mortgage.

Milton Roberts, Annotation, *Debts Included in Provision of Mortgage Purporting to Cover All Future and Existing Debts (Dragnet Clause)—Modern Status,* 3 A.L.R.4th 690, 694–695 (1981). Dragnet clauses have also been referred to as "anaconda, conglomerate, other indebtedness, open end, blanket, or omnibus clauses." 3 A.L.R.4th at 694–695, n. 3. Such clauses were recognized at common law. *Lawrence v. Tucker,* 64 U.S. (23 How.) 14, 27, 16 L.Ed. 474 (1859); *U.S. v. Hooe,* 7 U.S. (3 Cranch) 73, 89, 2 L.Ed. 370 (1805); *see also* 1 Jones on Mortgages, § 448 at p. 574 (8th ed. 1928).

Dragnet clauses are generally upheld, but because their apparent coverage is so broad, and because the mortgagor is often unaware of their presence or implications, the courts tend to construe them narrowly against the mortgagee. Generalizations are difficult, since the language of the particular clause may be a decisive factor. However, the following illustrations show numerous ways in which the courts have narrowed the application of dragnet clauses. Sometimes such holdings are said to be based on the intention of the parties, but in reality they usually represent the court's conceptions of fairness and equity. These illustrations are not intended to represent any majority rule, as there are many conflicting or contrary cases.

Nelson, Whitman, *Real Estate Finance Law,* § 12.8 at pp. 899–900 (2nd ed. 1985) (footnotes omitted).[4]

4. The illustrations given by Nelson and Whitman are: 1) the mortgage will only secure future advances, 2) only debts of the same type or character as the original one are also secured by the mortgage, 3) future debts will be covered by the mortgage only if the documents evidencing those debts specifically refer back to the dragnet clause, 4) future debts secured by separate security will not be secured by the dragnet mortgage, 5) dragnet clause will not apply to debts originally owed by the mortgagor to third parties and which were assigned to or purchased by the mortgagee, 6) where there are several joint mortgagors, only future debts on which all are obligated or of which all are aware will be covered by the clause, 7) once the original debt has been fully discharged, the mortgage is extinguished and cannot secure future loans, 8) if the mortgagor transfers the realty to a grantee, any debts thereafter incurred by the mortgagor are not secured by the dragnet mortgage, and 9) if the mortgagor transfers the realty to a grantee, advances thereafter made by the mortgagee to the grantee are not secured by the mortgage, even if the mortgage has been expressly assumed by the grantee. *Real Estate Finance Law,* § 12.8 at pp. 900–902.

It is impossible to neatly compartmentalize the treatment of dragnet clauses in American courts, because the results are so divergent. There is no clear majority rule or standard for enforcement or application of such clauses. *Dragnet Clause—Modern Status,* 3 A.L.R.4th 690, 694–695 (1981). The following cases illustrate some of the diverse treatments afforded dragnet clauses by different courts.

Some courts enforce dragnet clauses literally, according to their plain meaning. For example, in *First National Bank in Dallas v. Rozelle,* 493 F.2d 1196 (10th Cir.1974), the court considered whether, under Oklahoma law, three notes executed by the defendant were secured by virtue of a dragnet clause in a previously executed mortgage. The mortgage related to business operations on the defendant's leasehold property, while the subsequent notes were for unrelated ranching operations. Separate security had been taken for each of the subsequent notes. The trial court had concluded the subsequent notes were not secured by the mortgage. The Tenth Circuit reversed, holding that the dragnet clause in the mortgage extended to the subsequent loans, based on the "clear and broad" language of the clause. Although the court indicated that the surrounding circumstances and the relationship of the parties should be considered when construing the contract, its ruling was based on the "plain meaning" of the dragnet clause.

> [T]he findings that Rozelle did not intend that the Hughes County mortgage would secure the Pushmataha County loans and that they were not contemplated by the parties to the mortgage are not controlling. Such an agreement to secure future advances must necessarily intend to secure sums that are indefinite and uncertain at the time the mortgage is executed.

*Id.* at 1201. Similarly, in *In re Dorsey Electric Supply Co.,* 344 F.Supp. 1171, 1175 (E.D.Ark.1972), the court held that subsequent loans were encompassed within a prior security instrument based on "the clear and unambiguous language" of a dragnet clause.

By contrast, in *Canal National Bank v. Becker,* 431 A.2d 71 (Maine 1981), the court found that a dragnet clause could not be literally enforced, since such a clause was, by nature, ambiguous. The court considered whether a mortgage executed by the Beckers which contained a dragnet clause secured other loans to the Beckers' business, which the Beckers had personally guaranteed. The clause purported to secure both prior debts and future advances "made at the option of Grantee ... all of which debts, obligations and advances may be evidenced by notes, credits, open accounts, overdrafts, endorsements, **guaranties** and any form of indebtedness, direct [or] indirect. . . ." *Id.* at 72–73. The bank contended the dragnet clause was unambiguous and should be enforced according to its terms. The court disagreed, stating:

> A future advances clause such as the one here in question is, however, by its very nature, ambiguous. Where the mortgagee is under no obligation to make future advances, as here, a mortgage, purporting to secure future advances, cannot secure such advances until they are actually made. **"At most,** those provisions represent an offer by the mortgagor to provide the security of the mortgage for such advances if and when they are made." If such offer is accepted by the mortgagee in making a subsequent advance, then the subsequent advance is secured by the original mortgage. This always necessarily raises the question of the parties' intent at the time of the making of the subsequent advance. Since the trial court must look to the parties' intentions both at the time of the mortgage and at the time of the subsequent advance, the court cannot rely solely on the language of the dragnet clause. . . .

*Id.* at 73 (citations omitted). The court adopted the following test, from *Emporia State Bank and Trust Co. v. Mounkes,* 214 Kan. 178, 519 P.2d 618, 623 (1974), for interpreting dragnet clauses:

> [I]n the absence of clear, supportive evidence of a contrary intention a mortgage containing a dragnet type clause will not be extended to cover future advances unless the advances are of the same kind and quality or relate to the same transaction or series of transactions as the principal obligation secured or unless the document evi-

dencing the subsequent advance refers to the mortgage as providing security therefor.

*Canal National Bank,* 431 A.2d at 75.

In the *Emporia State Bank* case, the court considered whether a dragnet clause in a residential mortgage executed by the debtors in 1963 secured a note executed by the husband eight years later for the purpose of helping his son start a business. The clause at issue purported to secure the mortgage loan "and all other sums which may hereafter be owing to the mortgagee by the mortgagors or any of them, however evidenced." *Emporia State Bank,* 519 P.2d at 620. The trial court had concluded the mortgage secured the subsequent loan. The Supreme Court of Kansas disagreed, noting that the only supporting evidence for this conclusion was the dragnet clause itself which, under the circumstances, did not reflect the true intent of the parties. *Id.* at 623. Since there was no evidence that the two loans were related, the court held that the loan to the son was not secured by the prior mortgage.

## ARIZONA LAW

Arizona law is applied to determine the enforceability of the dragnet clauses at issue before us, and the extent of WFCB's secured claim. *Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979).

In *Griffith v. State Mutual Building & Loan Ass'n,* 46 Ariz. 359, 361, 51 P.2d 246, 248 (1935), the Arizona Supreme Court upheld an open-end mortgage. The court enforced a future advance clause so that it applied not only to the initial mortgage but also to a subsequent note which stated, on its face, that it was to be secured by the mortgage. The issue before the court was whether a party who purchased the mortgaged property after the second note was executed took the property subject to both notes. The court held that the purchase was subject to both notes.

Because the second note expressly stated it was also to be secured by the mortgage, the court's enforcement of the future advance clause in *Griffith* was understandable. The mortgage provided that it would secure not only the initial loan, but any other notes evidencing additional advances by the mortgagee. The subsequent note, between the same parties, expressly stated that it would be secured by the prior mortgage.

Subsequent Arizona cases, however, have developed tests to determine the enforceability of dragnet clauses in more complex circumstances. In *Pearll v. Williams,* 146 Ariz. 203, 704 P.2d 1348 (Ct.App.1985), the appellate court extended an open-end mortgage to a subsequent loan between the same parties. The court adopted two tests found in *Union Bank v. Wendland,* 54 Cal.App.3d 393, 404, 126 Cal.Rptr. 549 (Cal.App.1976), stating:

> In *Union Bank, supra,* two tests are suggested as methods for analyzing whether the security of the first loan also secures a second loan when a dragnet clause is used. Under the "relationship of the loans" test, the security instrument will secure both loans where the parties' intent to do this is inferred from the connection between the loans or from their substantially similar nature. The "reliance on the security" test determines whether the second loan relied on the original security. Under this second test, the continuing offer to secure future loans with the first security instrument is not accepted when, for example, the second loan utilizes different security.

*Pearll,* 146 Ariz. at 207, 704 P.2d at 1352. The "relationship of the loans" test follows criteria similar to those adopted by the courts in *Canal National Bank* and *Emporia State Bank.*

In *Pearll,* the Williams executed a note for $7,000 which specified it was to be secured by an escrow. However, the Williams also executed an open-end mortgage the same day. The court found that the mortgage was security for the $7,000 note, even though the note specified other collateral, because the documents were executed contemporaneously. The Williams had initialled the open-end provision in the mortgage. The mortgage was a second lien against certain realty. A subsequent loan between the same parties, in the sum of $5,100, stated it would be secured by a "second mortgage on real property." Applying the "reliance on the security" test

to these facts, the court concluded that since there was only one second mortgage at issue, the subsequent loan was also secured by it.

In *L.B. Nelson Corp. of Tucson v. Western American Financial Corp.*, 150 Ariz. 211, 722 P.2d 379 (Ct.App.1986), the court upheld dragnet clauses in several deeds of trust to permit the lender to foreclose on an entire housing project. Western American had agreed to finance the project, consisting of 4 completed townhouses and 42 undeveloped lots, under a letter of commitment dated June 26, 1981. A $680,000 acquisition and development (A & D) loan was secured by a deed of trust against all parcels in the development. For a portion of the construction financing, Western American took 4 separate notes, each secured by deeds of trusts on the 4 completed townhouses.

In April, 1982, Nelson was in default on the A & D loan and the 4 townhouse notes were also due. Nelson was unable to pay, but told Western American it had buyers for townhomes to be constructed on 4 of the unimproved lots. Nelson also advised it had a cash buyer for another unimproved lot. Based on these representations, Western American released 4 lots from the A & D deed of trust and deducted amounts for construction on these lots from the A & D loan. The construction amounts were evidenced by separate notes and deeds of trust on the 4 lots which had been released from the A & D deed of trust.

In September, 1982, Nelson was still delinquent on the A & D and 4 townhouse loans. The loans for the 4 lots which had been released from the A & D loan had not yet matured. Buyers hadn't materialized for the townhomes under construction, and Nelson hadn't applied any of the cash it had received from the sale of the one unimproved lot to the Western American loans. Western American refused to issue any more draws and commenced foreclosure on the entire project. Nelson contested the foreclosure, arguing that the dragnet clauses were ambiguous and that Western American couldn't foreclose on the 4 parcels which had been released from the A & D loan, because those construction loans hadn't matured yet.

The appellate court found, as did the trial court, that the dragnet clause at issue was unambiguous.[5]

> The trial court disagreed [that the dragnet clause was ambiguous] and we believe properly so. Not only is the language clear, Nelson suggests no other meaning for the clause.

*Nelson*, 150 Ariz. at 215, 722 P.2d at 383. Notwithstanding the fact that the dragnet clause was unambiguous, the court found that the two tests set out in *Pearll* were applicable to determine its enforceability.

The ruling of the trial court, in effect upholding the enforceability of the dragnet clause, comports with the only Arizona opinion on the subject, *Pearll v. Williams*, 146 Ariz. 203, 704 P.2d 1348 (App.1985).

. . . .

> In *Pearll* we relied on *Union Bank v. Wendland*, 54 Cal.App.3d 393, 126 Cal. Rptr. 549 (1976), for the proposition that **there are two tests to determine whether or not a cross-default [or dragnet] clause will be enforced, namely, the "relationship of the loans" test and the "reliance on the security" test.** We upheld the dragnet clause under the "reliance on the security" test. It was not necessary for the court to reach the "relationship of the loans" test, but we surely did not reject it. That is the appropriate test to be applied here.

*Nelson*, 150 Ariz. at 215, 722 P.2d at 383 (emphasis added).

Applying the "relationship of the loans" test, the court upheld the dragnet clauses and concluded Western American could foreclose on the entire project. Even though Western American had released 4 lots from the A & D loan, the court found no evidence that the lender had intended to give up its right to have the entire project as security

---

**5.** The dragnet clause at issue in *Nelson* provided, "In addition to securing the indebtedness herein mentioned, this Deed of Trust shall also secure any and all additional indebtedness of trustor to beneficiary or trustee whether as future advance-ments or otherwise." *Nelson*, 150 Ariz. at 214, 722 P.2d at 382. It is not unlike the clauses at issue here which, although more lengthy, purport to secure any and all debts of the Auzas to WFCB.

for its loans. Western American's total loan commitment remained unchanged, even after the 4 lots were released from the A & D deed of trust. All the loans were used to fund the same project. The same dragnet clause was found in all the deeds of trust. The court concluded that all the lots were intended to remain as security for the loans.

WFCB contends the tests enunciated in *Pearll* and *Nelson* are inapplicable in this case because the dragnet clauses it seeks to enforce are unambiguous. It would have the court enforce the dragnet clauses based on their plain meaning, as did the courts in *Rozelle* and *Dorsey Electric.* However, as noted above, the court in *Nelson* held that the "relationship of the loans" and the "reliance on the security" tests were applicable to determine the enforceability of a dragnet clause in Arizona, even where the clause at issue was unambiguous. Alternatively, WFCB contends that even if the two tests are applicable, the dragnet clauses should be interpreted to secure the portion of its claim attributable to the Auza's guarantee for the QGI notes.

■ In this case, the parties and the bankruptcy court correctly concluded that the only test at issue was the "reliance on the security" test. The Auza notes and the QGI notes are not connected, nor do they have a substantially similar nature. The "relationship of the loans" test cannot be met.

Applying the "reliance on the security test" to the facts of this case, the record reflects that WFCB relied on different security for the QGI loans than the collateral for the Auza farm loans. Both QGI notes expressly stated that they were to be secured by personal property liens against QGI assets and a deed of trust against QGI realty. WFCB's internal loan documents also indicated that the QGI notes were to be secured by QGI assets. Both QGI loans were believed to be adequately secured by this collateral. However, because QGI was a new entity without a credit history, the net worth of both Joe Auza and his partner, Joe Riley, were also relied upon by WFCB in extending the QGI loans, and both of these individuals were required to sign continuing guarantees. Nothing in the record indicates WFCB considered Auza's personal guarantee more valuable than Riley's on account of the dragnet clauses in the security instruments Auza had previously executed in connection with his farm loans.

The record is devoid of any facts which show WFCB relied on the Auza security in extending the QGI notes. The evidence reflects that the Auza farm loans and the QGI loans were two separate, unrelated transactions. After the QGI loans were extended, when the Auza farm loans were modified, the only reference made to the QGI indebtedness indicates that the Auza loans and the QGI loans were to be treated as two completely independent transactions.

WFCB argues that the collateral for the Auza notes was collateral for the *guarantee* given by the Auzas for the QGI notes, rather than collateral for the QGI notes themselves. However, this distinction does not alter the result. WFCB's loan documents do not discuss any security for the guarantees themselves. The loan documents only mention the "net worth" of both principals of QGI, and indicate that continuing guarantees are required of both. There is no indication that Auza's guarantee was more valuable than Riley's on account of the dragnet clauses.

Applying the "reliance on the security" test contained in *Pearll,* the bankruptcy court concluded that the portion of WFCB's claim attributable to the QGI notes was unsecured. We agree. Neither the QGI loan documents nor the guarantees referred to the dragnet clauses in the prior security instruments, and WFCB obtained separate collateral for the QGI loans.

Additional arguments advanced by WFCB are also unpersuasive. WFCB contends the tests set out in *Pearll* are inapplicable in this case because in *Pearll* the court considered an "open-end mortgage", which should be treated differently from other dragnet clauses. This contention is unsupported. The court in *Pearll* treated the "open-end mortgage" clause like any other dragnet clause.[6]

6. "The open-end mortgage, like other dragnet    clauses, 'constitutes a continuing offer by the

The *Pearll* case cannot be distinguished simply because it involved an open-ended mortgage.

Finally, WFCB asserts the analysis of the bankruptcy court in *In re Bass,* 44 B.R. 113 (Bankr.D.N.M.1984) should control the outcome of this case. *Bass* is distinguishable because it involves the application of New Mexico law, which does not utilize the tests found in *Pearll* and *Nelson.*

### CONCLUSION

The "reliance on the security" test contained in *Pearll v. Williams,* 146 Ariz. 203, 207, 704 P.2d 1348, 1352 (Ct.App.1985), is applied to determine whether dragnet clauses in the Auza farm loan security instruments secure the Auza's personal guarantee of the QGI loans. We agree with the bankruptcy court that, because neither the QGI loan documents nor the Auza guarantee referred to the dragnet clauses in the prior security instruments, and because WFCB had obtained additional collateral for the QGI loan, the portion of WFCB's claim attributable to the QGI notes is unsecured.

AFFIRMED.

borrower to secure future loans under the security.' " *Pearll,* 146 Ariz. at 206–07, 704 P.2d at

1351–52 (citation omitted).