**In re David Son KIM, Debtor.**

No. 00–07243–A13.

United States Bankruptcy Court, S.D. California.

Dec. 11, 2000.

---

794

Jonathon R. DeSimone, San Diego, CA, for debtor.

Michael Koch, San Diego, CA, for Thomas H. Billingslea, Chapter 13 Trustee.

Martha E. Romero, Whittier, CA, for County of San Diego.

Tracy L. Schweitzer, Severson & Werson, PC, San Francisco, CA, for First Nationwide Mortgage Corp.

Timothy J. Silverman, Soloman, Grindle, Silverman & Spinella, a Professional Corporation, San Diego, CA, for Kearny Mesa Financial Credit Union.

## MEMORANDUM DECISION

LOUISE DeCARL ADLER, Chief Judge.

### I.

### INTRODUCTION

Creditor Kearny Mesa Financial Credit Union ("KMFCU") moves for relief from stay or adequate protection of its security interest in David Son Kim's ("Kim") 1996 Buick Regal. KMFCU repossessed the Buick prepetition. It refuses to turn over the Buick until Kim classifies KMFCU as a secured creditor in his chapter 13 plan and provides adequate protection of its interest.

KMFCU contends it is a secured creditor because Kim signed a security agreement with a cross-collateralization clause.[1] This clause granted the Buick as security for all of Kim's other loans with KMFCU. Kim paid off his car loan, but did not pay off his Visa credit card. Therefore, KMFCU repossessed the Buick to collect the Visa debt.

Kim refuses to classify KMFCU as a secured creditor or provide adequate protection of its interest. He argues he was unaware of the cross-collateralization clause, and never intended to grant the Buick as collateral to secure repayment of the Visa debt. No one from KMFCU pointed out the cross-collateralization clause; nor did they explain the Buick would secure his Visa debt. Accordingly, the cross-collateralization clause is unenforceable due to his lack of intent.

Additionally, Kim argues KMFCU acted inequitably. Kim's prior chapter 7 bankruptcy discharged his personal liability. KMFCU allowed Kim to retain the Buick and pay the car loan to create equity in the Buick. It never disclosed it would repossess the Buick after the loan was fully paid.

Because KMFCU's security interest is disputed, the Court ordered the Buick returned pending an evidentiary hearing on whether it was entitled to adequate protection. The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334 and General Order 312–D of the United States District Court. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(B) and (K). After considering all the evidence and the arguments of counsel, the Court denies KMFCU relief from the automatic stay and denies its request for adequate protection as a secured creditor.

1. Cross collateralization clauses are also known as "dragnet clauses." Hereinafter, the Court will use the two terms interchangeably.

## II.

### FACTUAL BACKGROUND

Sometime in late 1995, Kim, an inspector at Solar Turbines, Inc., purchased a 1996 Buick Regal for $20,000, financing the purchase through KMFCU. On September 14, 1995, he executed a multi-page document titled "Disclosure Statement, Loan Agreement and Security Agreement" ("Loan No. 1"), giving the car as security for the purchase price. The Security Agreement portion of Loan No. 1 includes a cross-collateralization clause which provides:

> To protect us in case you default on your loan, you give us a security interest in the property [collateral] described on the attached page. This security interest will cover both the property listed and any additions you may make to it as well as the proceeds from the sale of the property. **You agree that this collateral secures other loans you have with us, and collateral securing other loans also secures this loan.** This cross-collateral agreement does not apply to any property used as your dwelling.

[Exhibit 1] (Emphasis added.) The cross-collateralization clause is located on a different page than the interest rate and payment amount.

On January 6, 1996, Kim applied for a Visa credit card through KMFCU, executing a multi-page agreement which provided that the credit card would be paid by automatic deduction from his credit union account. The Visa card agreement does not reference Loan No. 1. After verifying his good credit, Kim was issued a Visa card with a $10,000 limit.

Kim decided to refinance Loan No. 1 to take advantage of a lower interest rate and shorter payment term. On February 5, 1996, he executed another Disclosure Statement, Loan Agreement and Security Agreement ("Loan No. 2") with KMFCU which contained the exact terms as Loan No. 1 except for the lower interest rate and shorter payment term.

Kim, an immigrant from Viet Nam who speaks and reads limited English, testified that when he signed Loan No. 1, he did not read the entire document but only those parts pointed out to him by the loan officer. According to his testimony, the only parts the loan officer pointed out to him, other than the interest rate and the payment amount, were the places to sign on the document. No one explained to him or pointed out the cross-collateralization clause.

When Kim applied for the Visa loan, no one from KMFCU explained to him that the Buick would be collateral for the Visa debt.

Finally, when Kim signed Loan No. 2, no one from KMFCU explained to him that the Buick would be collateral for the Visa debt or any other debts he had with the credit union. Once again, he read the first page of the agreement setting forth the interest rate, payment amount and term and then signed where directed by the KMFCU loan officer. Once again, no one explained to him or pointed out the cross-collateralization clause.

In August 1996, Kim filed a chapter 7 bankruptcy. He received a discharge on December 12, 1996. He was represented by an attorney who told him that the Visa debt would be discharged in his bankruptcy but if he desired to keep the car, he had to make the monthly payments until the car was paid off. And that is exactly what Kim did: Every week $112 was deducted from his account. And every month KMFCU sent him statements showing credits for these payments. Nothing on these statements indicated he would have to pay the Visa bill when his payments on the car loan were completed. Further, KMFCU did not send him any Visa statements showing a balance remained due.

Sometime in July 2000, Kim received a KMFCU statement showing that as of June 30, 2000, his balance on Loan No. 2 was "0". When he attempted to obtain the vehicle title, he was told by KMFCU's

attorney that he still owed $10,242.68 on the unpaid Visa account scheduled in his chapter 7 bankruptcy.

Kim and his wife conferred and decided this must be a mistake. They did not seek legal assistance, they ignored KMFCU's attorney's letter and they made no attempt to repay the Visa debt. When their car was repossessed by KMFCU, Kim filed this chapter 13 case. KMFCU moves for relief from stay, claiming it must be classified as a secured creditor and its security interest in the vehicle has not been adequately protected.

## III.

## ISSUES

1. Is the Visa debt covered by the Security Agreement?

2. How does the Court determine the intent of the parties?

3. Is the standard for determining intent of the parties applied only to future advances, or is it applicable to antecedent debts?

4. Did KMFCU act inequitably?

## IV.

## LEGAL ANALYSIS

### 1. *Is the Visa Debt Covered by the Security Agreement?*

The parties do not dispute that a valid security agreement was created. Rather, Kim contends the parties never intended the security agreement to cover the Visa debt. KMFCU counters that the security agreement clearly states that it covers all of Kim's loans and he should have known the security agreement covered the Visa debt. KMFCU argues the parties' intent is irrelevant in a transaction governed by the Commercial Code.

■ KMFCU is incorrect. In a transaction governed by the Commercial Code,

the scope of the security agreement is determined by the intent of the parties. *New West Fruit Corp. v. Coastal Berry Corp.*, 1 Cal.App.4th 92, 98–99, 1 Cal. Rptr.2d 664 (1991). *New West Fruit* involved a dragnet clause similar to the one in this case. In that case, a co-op of strawberry growers entered into an agreement to obtain advances from a broker/lender. In exchange, the growers agreed to grant the broker/lender a security interest in their crops to secure *all of their obligations* under the agreement. *New West Fruit*, 1 Cal.App.4th at 95, 1 Cal.Rptr.2d 664.

Thereafter, a dispute arose as to the validity and scope of the security agreement. *Id.* at 96, 1 Cal.Rptr.2d 664. The court recognized the agreement need not specify the exact debts to create a valid security agreement. *Id.* at 98, 1 Cal. Rptr.2d 664. As to the scope of the secured obligations, the court held that the pivotal question is the intent of the parties:

> The pivotal question, therefore, is whether the challenged obligation [advances] is covered by the security agreement. This question can be answered only by ascertaining the intent of the parties to the transaction. . . .

> As noted above, the critical factor in defining the parameters of a security agreement is the intent of the parties. . . .

*Id.* at 98–99, 1 Cal.Rptr.2d 664. In ascertaining their intent, the court looked to the parties' reasonable expectations, utilizing the general principles governing commercial agreements as well as the specific rules pertaining to secured transactions. *Id.* at 99, 1 Cal.Rptr.2d 664.

According to *New West Fruit*, the critical inquiry is the intent of the parties. The Court must ascertain the parties' reasonable expectations to secure the Visa debt.[2]

---

2. Other non-Commercial Code cases are in accord. *See Wong v. Beneficial Sav. & Loan*

*Ass'n*, 56 Cal.App.3d 286, 293, 128 Cal.Rptr. 338 (1976) (recognizing that "California

### 2. *How Does the Court Determine The Intent of the Parties?*

■ Next, the Court must decide the appropriate method of determining the parties' intent. Kim asks the Court to apply the "relationship of loans" and "reliance on the security" tests adopted by the California Court of Appeals in *Wong v. Beneficial Sav. & Loan Ass'n,* 56 Cal. App.3d at 295, 128 Cal.Rptr. 338 and *Union Bank v. Wendland,* 54 Cal.App.3d 393, 404, 126 Cal.Rptr. 549 (1976). KMFCU disagrees, claiming these tests are inapplicable because they were adopted in cases that involved real property. It argues that real property cases have unique anti-deficiency concerns not present in personal property secured transactions and it is these concerns which influenced the decisions to use these tests.

This Court is not persuaded by KMFCU's analysis. A review of these cases reveals only *Wendland* even mentioned the anti-deficiency legislation. Further, the *Wong* court's exhaustive discussion of dragnet clauses indicates that the court was more concerned with the inherent possibility of overreaching and inequity in enforcing these clauses than it was with any aspect of California real property law. *Id.* at 292–96, 128 Cal.Rptr. 338. Accordingly, the Court disagrees that "anti-deficiency" concerns limit these tests to real property cases.

Although there is no California case directly on point, *New West Fruit* instructs that these tests also apply to the cases involving the Commercial Code. Specifically, the court indicated it must utilize both specific provisions in the Commercial Code and the "general principles governing commercial agreements" to determine the intent of the parties, recognizing implicitly

that other tests are appropriate. *Id.* at 99, 1 Cal.Rptr.2d 664.

At least two other courts have held that these tests apply to cases involving the California Commercial Code. The bankruptcy court in *In re Gibson,* 234 B.R. 776, 781 n. 2 (Bankr.C.D.Cal.1999), indicated it would apply *Wendland* and *Wong* to a dragnet clause to ascertain the parties' intent. As in this case, *Gibson* considered whether a dragnet clause executed in connection with a car loan covered the debtor's credit card debt. *Gibson,* 234 B.R. at 778. The court applied Illinois law because of the choice of law provision in the security agreement. *Id.* at 779–80. It invalidated the dragnet clause under Illinois law, and indicated it would have reached the same result if California law applied. *Id.* at 781 n. 2. Although not fully explained, the court appears to conclude the parties could not have intended the dragnet clause to cover the credit card debt where the debtor was unaware of its inclusion in the security agreement.

Similarly, the Ninth Circuit Bankruptcy Appellate Panel ("BAP") in *In re Auza,* 181 B.R. 63, 68 (9th Cir. BAP 1995) applied *Wendland* and *Wong* to a dragnet clause covering loans secured by both real and personal property. The BAP indicated Arizona courts have adopted the tests enumerated in *Wendland* and *Wong* as the controlling tests in Arizona. *Auza,* 181 B.R. at 68. The *Auza* court found the language in the dragnet clause clear and unambiguous. *Id.* at 69. Notwithstanding, it invalidated the dragnet clause because the "reliance on the security" test was not met. *Id.* at 70.[3]

The Court is persuaded by the above authorities. Therefore, it holds the "relationship of loans" and "reliance on the security" tests also apply to cases arising under the Commercial Code.[4]

---

courts have rather consistently tended to prefer a construction that is more faithful to the parties' actual expectations than to the literal wording of the [dragnet] clause").

**3.** Again, the BAP indicated some of the collateral consisted of personal property. *Id.*

**4.** The Court is aware of new U.C.C. § 9–204, effective July 1, 2001, and Official Comment No. 5, which rejects the continued use of these tests to ascertain the parties' intent. It is premature to address the effect of this directive on existing case law.

KMFCU did not argue either test was met, even though it bears the burden of establishing both parties' intent. *See Wong,* 56 Cal.App.3d at 294, 128 Cal.Rptr. 338 (indicating the burden should be on the proponent to show both parties' intent to include the challenged debt). Notwithstanding, the Court will explain why neither test has been met.

■ First, in applying the "relationship of loans" test, the Court examined the relationship of the car loan and the Visa debt to each other. *See Wendland,* 54 Cal.App.3d at 404, 126 Cal.Rptr. 549 ("relationship of loans" examines the relationship of the two loans to each other to infer the parties' intent to secure both debts). It finds the car loan and Visa debt unrelated except for their classification as consumer debts. The Court is aware that some courts have found debts "of the same class" sufficiently related to meet the relationship of loans test. *See e.g. In re James,* 221 B.R. 760, 764 (Bankr.W.D.Wis. 1998) (finding car loan and credit card debt sufficiently related because they are "of the same class"). But *Wendland* instructs otherwise. Specifically, *Wendland* holds that the two loans must *relate to each other* to satisfy the "relationship of loans" test. *Wendland,* 54 Cal.App.3d at 404, 126 Cal.Rptr. 549 (loans related if, for example, they relate to improvements on the same real property). There is no evidence the car loan and Visa debt *relate to each other.* Accordingly, the "relationship of loans" test is not met.

■ Similarly, the "reliance on the security" test is not met. This test looks to whether the creditor made the second loan in reliance on the original security. *Id.* at 404–05, 126 Cal.Rptr. 549. There is no evidence KMFCU approved the credit card in reliance on the Buick. To the contrary, KMFCU testified it verified Kim's good credit and issued the card. The Visa application does not reference the Buick. In summary, neither test has been met.

### 3. *Do the Same Standards Apply to Antecedent Debts?*

■ Additionally, KMFCU argues the intent of the parties is not relevant where a security agreement secures antecedent debts. Because the Visa credit card was approved *before* Loan No. 2, it argues the Visa debt is an antecedent debt. This argument places form over substance and ignores the parties' relationship from its inception. Further, this argument assumes all the Visa charges were incurred *before* Loan No. 2 when no evidence of this fact was presented. Accepting KMFCU's characterization as correct, it is irrelevant; the same standard applies to antecedent debts.

Again, *New West Fruit* is instructive. In that case, the record showed the advances were made before and after the agreement was executed. *New West Fruit,* 1 Cal.App.4th at 100, 1 Cal.Rptr.2d 664. Notwithstanding, the court applied the same standard for all of the advances. *Id.* The critical inquiry was the intent of the parties to secure the challenged debt.

The Bankruptcy courts that considered the issue have applied the same standard to antecedent debts. *In re Wollin,* 249 B.R. 555, 560 (Bankr.D.Or.2000) (concluding there is no reason to apply a lesser standard for antecedent debts than for future advances); *Gibson,* 234 B.R. at 778 (indicating the credit card was antecedent to the car loan, but making no distinction as to the applicable test).

Accordingly, the same standard for determining intent of the parties applies to antecedent debts.

### 4. *Did KMFCU Act Inequitably?*

■ Finally, Kim argues that KMFCU acted inequitably. He provided no points and authorities on the legal effect of KMFCU's inequitable conduct, but asserted that inequitable conduct is a factor to consider in denying the motion.

The Court agrees KMFCU acted inequitably. KMFCU took advantage of its superior bargaining position in prescribing the terms of the car loan. It did not disclose or explain the scope of the cross-collateralization clause even though it is readily apparent Kim speaks and reads limited English. Thereafter, it permitted Kim to retain the Buick and pay the car loan to create equity in the Buick.[5] It never told Kim it would repossess the Buick after the car loan was fully paid.

The Court is troubled by KMFCU's conduct. It is unfair to enforce this type of clause in a situation of unequal bargaining power where the clause was never disclosed or explained. *See Wong,* 56 Cal. App.3d at 297, 128 Cal.Rptr. 338 (observing that relief from a dragnet clause involves principles of equity and the plaintiffs' scheme was undeserving of equity); *Auza,* 181 B.R. at 66 (recognizing that a court's decision to narrow a dragnet clause ultimately turns on what was fair and equitable). The equities of this case further support the decision to deny the motion.

## V.

### CONCLUSION

The Court denies KMFCU's motion for relief from stay or, in the alternative, for adequate protection because it failed to establish the Security Agreement in Loan No. 2 includes the discharged Visa debt. The literal language could have included the Visa debt, but the parties' intent was otherwise. Further, KMFCU has acted inequitably. Overall principles of fairness and equity support the Court's decision to deny the motion.

This Memorandum Decision is in lieu of findings of fact and conclusions of law. Counsel for Kim is directed to prepare and lodge an order in accordance with this

Memorandum Decision within ten days of the date of its entry.

---

**5.** The schedules in Kim's prior bankruptcy filed October 2, 1996 confirm the Buick had no equity.